Anthony MANN, Alvin James Hale, John Duvall and Scotty Lee Moore, on their own behalf, and on behalf of a class of all current and future Oklahoma inmates sentenced to death and housed on Death Row at the McAlester State Penitentiary, Plaintiffs,

v.

Dan M. REYNOLDS, individually, and in his official capacity as Warden of the Oklahoma State Penitentiary; Rita Andrews, individually, and in her official capacity as Deputy Warden of the Oklahoma State Penitentiary; Fred Cook, individually, and in his official capacity as Unit Manager of H–Unit (Death Row Unit) of the Oklahoma State Penitentiary; Larry Fields, individually and in his official capacity as Director of the Oklahoma Department of Corrections; David Walters, in his official capacity only as Governor of the State of Oklahoma; and Robert Sanders, individually and in his official capacity as Coordinator, Substance Abuse/Mental Health Services, Defendants.

No. CIV–92–893–C.

United States District Court, W.D. Oklahoma.

July 21, 1993.

Order Granting in Part Motion to Amend and Otherwise Denying Motion for New Trial or to Amend Aug. 24, 1993.

Order Finding Compliance with Decision Aug. 24, 1993.

Order Vacating Stays of Execution Aug. 24, 1993.

Donald G. Bledsoe, Tulsa, OK, and Micheal C. Salem, Norman, OK, for plaintiffs.

Wellon B. Poe, Jr. and Guy L. Hurst, Office of the Atty. Gen., Oklahoma City, OK, for defendants.

## MEMORANDUM OPINION

CAUTHRON, District Judge.

This case was tried to the Court without a jury on June 17–18, 1993. Plaintiffs appeared personally and with counsel, Gregory Bledsoe and Micheal Salem; defendants appeared through Assistant Attorneys General Guy Hurst and Wellon Poe. In light of all the testimony and documentary exhibits, and having considered the closing arguments of counsel presented by written briefs, the Court enters the following findings of fact and conclusions of law.[1]

### History of Case

This case was filed May 21, 1992, seeking injunctive and declaratory relief regarding the policy and practice of Oklahoma State Penitentiary at McAlester, Oklahoma (OSP) as to attorney visitation with death row inmates. During or between various hearings set during the summer of 1992, counsel agreed on a stay of execution for the affected inmates and requested time and assistance in settling the remaining disputes. The Court directed monthly status reports regarding settlement negotiations, and pursuant to a joint request of counsel continued the case to allow the parties and counsel time to reach an agreeable compromise. In March 1993, a status and scheduling conference was held, at which pretrial deadlines and a trial date were set. Shortly before trial, the Court certified a class, pursuant to Fed.R.Civ.P. 23(b)(2), consisting of persons now or in the future sentenced to death and housed on OSP's H–Unit. Class certification and, accordingly the trial, was restricted to the following two issues: (1) whether the class members are receiving confidential attorney visits; and (2) whether the class members are entitled to full-contact attorney visits. (Order at 3 (June 11, 1993)). In this same order, the Court denied motions to intervene filed on behalf of several death row inmates whose executions have been recently scheduled. The motion for stay was granted as to plaintiff Foster, whose execution was imminent, but denied as to the remainder of the class. After discussion with counsel in chambers before trial, the Court announced its intention to stay all execution dates until either an order denying relief, or the defendants' compliance with an order granting relief, assuming the Oklahoma Court of Criminal Appeals would not reset execution dates until the expiration of 60 days from the triggering order. See 22 Okla.Stat. § 1001.1 (1993 Supp.). Counsel voiced no objection to this procedure, and consequently, specific proof regarding the various inmates' stays of execution was not offered. Likewise, the Court limited proof to the circumstances now existing at OSP, as only declaratory and injunctive relief is sought. All parties and the Court recognize that changes have been made since the institution of this suit, but proof on any pre-existing condition is now irrelevant. A significant issue raised in the initial pleadings was the need for full-contact settings for psychological experts to conduct tests and interviews with inmates. This has been resolved and such visits are now permissible under certain circumstances.

### Findings of Fact

1. Plaintiffs Mann, Hale, Duvall, and Moore are inmates imprisoned at OSP.

---

**1.** The closing argument of Micheal Salem on behalf of plaintiff class has been disregarded insofar as it refers to facts and evidence not presented at trial.

They are assigned to H–Unit, a new facility for death row and high-maximum security inmates. They sue on their own behalf and on behalf of a class of all present and future death row inmates.

2. Defendant Reynolds is the Warden of OSP; defendant Cook is Unit Manager of H–Unit; defendant Walters is sued only in his official capacity as the Governor of the State of Oklahoma. Defendants Andrews, Fields, and Sanders are respectively the Deputy Warden of OSP, the Director of the Oklahoma Department of Corrections (DOC), and the Coordinator of Substance Abuse/Mental Health Services. Each of these defendants is sued individually and in his or her official capacity. The Court has heard no proof regarding any personal acts of any of the defendants, and they are entitled to dismissal from the suit in their individual capacities. Any injunctive and declaratory relief, the only remedies sought, applies to these defendants only in their official capacities. However, defendant Sanders' presence as a defendant in this case is a mystery as there has been no evidence concerning him or his office and he is entitled to dismissal for a complete failure of evidence against him.

3. Jurisdiction is proper in this Court under 28 U.S.C. § 1331. Plaintiffs allege all defendants, while acting under color of state law, have deprived them of their rights to an attorney and to meaningful access to the courts under the Sixth and Fourteenth Amendments to the United States Constitution.

4. Venue has not been challenged and is proper in this Court.

5. OSP is the state's maximum security prison which operates in a facility built in 1908, with several later additions. From at least 1978 until November 1991, death row inmates were housed in F–Block in the main building at OSP. F–Block, while considered high maximum security, had cells with open-bar doors. Attorney visitation was in the Captain's office in a small room providing full contact between attorney and client. The room could be observed by a correctional officer (CO) through a glass window in one wall. The room was furnished with a table and chairs and prisoners were fully restrained with leg shackles, handcuffs, and a belly chain, while in the room with an attorney. The attorney was searched before, and the inmate both before and after, visitation.

6. There has never been an assault, an attempted assault, or a threatened assault on an attorney in the history of OSP. Witnesses familiar with other correctional institutions across the nation and/or with literature regarding corrections issues testified unanimously that in their knowledge there had been no such assault, attempt, or threat by a death row inmate against an attorney anywhere in the nation.

7. While death row was in F–Block and attorneys were allowed full-contact visitation, an attorney with the Oklahoma Indigent Defense System (OIDS) was reportedly observed by prison employees kissing a death row inmate in the attorney visitation room. This attorney was barred from contact visitation for a period of time. Whether what was observed was actually a kiss rather than a hug of sympathy is now in dispute. However, the Court accepts as true, for the purposes of this trial, the incident report as written.

8. This same attorney for OIDS, in an earlier incident, was found to have given a pack of cigarettes to a different inmate during a full-contact visit. The attorney later stated he did not know that such conduct was against prison policy or rules.

9. Although there is no documentation in the record, the Unit Manager testified that a different OIDS attorney, when found with food during the pre-visit search, indicated it was her lunch; yet she gave the food to the death row inmate she was visiting.

10. Prison witnesses testified generally that attorneys were likely to pass contraband to inmates during visits. This contraband was limited to pens, pencils, and paperclips (useful to make weapons or lock picks), chewing gum (effective at jamming locks), and cigarettes, money, and food. No specifics, either as to time, identity of attorney, or contraband involved, were given, other than those mentioned in ¶¶ 8 & 9. James Saffle,

formerly warden at OSP and currently Regional Director of DOC, testified that he was aware of no attorney who repeated this conduct once informed it was inappropriate.

11. There was no written policy regarding attorney visitation until May 12, 1993. Prison officials testified that the general visitation policy applied to H–Unit, that is, nothing was to be given to any prisoner. It is undisputed that this policy was never followed, in that attorneys were observed to pass documents, papers attached with paperclips, pens, pencils, and all necessary accoutrements of legal representation to the prisoners, without objection, and indeed out of necessity. The real complaint appears to be that the attorneys did not always make sure that clients returned all items. There is no direct proof or inference that this conduct was out of any intent to break the rules or cause security problems, but was rather out of ignorance of the possible uses of these items as posing a security risk or otherwise against prison policy.

12. Death row inmates were allowed private telephone calls with attorneys in their cells in F–Block. The telephone had a cord approximately 15 feet long so that the inmate could take the receiver to the back of the cell and achieve privacy, both from his cellmate when there was one, and from other inmates located in open-barred cells in close proximity.

13. In November 1991, H–Unit was opened to house death row inmates formerly located on F–Block. Other high-maximum security inmates are separately housed there as well. It was planned and designed by an informal committee of DOC personnel. The philosophy of those planning and now operating H–Unit was to have a non-contact facility, that is, inmates would have no contact with anyone else. This was for the safety and security of other inmates, staff members, and the public. The philosophy and the design of the new unit were modeled on the federal penitentiary at Marion, Illinois, the highest security facility in the federal system. There is no direct proof or reasonable inference that this non-contact philosophy was in response to any specific act or situation that existed in F–Block. Rather, it appears to be a general philosophy that the less the contact, the less the danger.

14. When H–Unit opened, there was no provision for confidential attorney visitation. The general visitation room is divided by a Plexiglas partition, the inmate and his visitor communicating by telephone. This was, of course, completely non-confidential and was replaced by what has been referred to as the visitation booth. This required the attorney to go into an enclosed booth with no ventilation and with room for only one person and talk to the client through a Plexiglas partition, using telephones. In an attempt to accommodate confidential attorney-client communications, the prison staff drilled a 2-inch hole in the wall to enable attorneys to pass documents. With regard to the facts found in this paragraph, the Court notes that counsel were specifically prevented from adducing evidence regarding prior conditions, no longer in issue for purposes of declaratory or injunctive relief. These descriptions of earlier attorney visitation accommodations are not for the purpose of determining with factual accuracy previous conditions. Rather, these general descriptions support the Court's finding that neither the planning committee nor apparently anyone else gave any thought whatsoever to attorney visitation before H–Unit opened.

15. Pursuant to the Court's earlier order that a policy on attorney and expert visits be memorialized, see Courtroom Minute of Proceedings (Oct. 16, 1992), DOC now has a written policy governing attorney-inmate and expert visits. This policy is plaintiffs' ex. 11 and is effective as of May 12, 1993. Other than the limited contact setting, there was no testimony or allegation that this policy is insufficient.

16. The current facility for attorney-client visitation is a room behind the Unit Captain's office observable through a glass and barred window. The inmate, wearing full restraints, is escorted by prison personnel to the designated half of the cubicle and seated there. The restraints, except for leg irons, are removed. The door to this space is then locked and the prison employee brings the lawyer in to sit on the other side of the room. The room is divided by a locking door and a metal

grate with diamond-shaped interstices of approximately ¾ inch which divides the room above a three-foot-wide counter. A pass-through space is approximately four inches tall and 16 inches wide. The pass-through space is sufficient to allow the inmate and attorney to shake hands and, of course, pass through any necessary documents. It is also sufficient to pass through any and all kinds of contraband that could have been passed during full-contact visits in the former death row unit.

17. All persons testifying who have used this grated space agreed that after five to fifteen minutes looking through the grate at someone on the other side, headaches, dizziness, lack of focus, and general malaise resulted to both inmate and attorney. Prison officials have agreed that a clear Plexiglas or equivalent window at eye height should be placed in the grate to allow unimpeded vision.

18. Only fourteen inmates of the approximately 125 on death row are not double-celled. Like attorney visitation, there was no provision made in H–Unit for receipt or instigation of attorney phone calls by death row inmates. Since the time this suit was instituted, prison personnel have attempted to accommodate this need and the present procedure is a rolling telephone cart that can be taken directly to the cell of any inmate. The receiver is then passed through to the inmate, and the number dialed by staff. No incoming calls may be received but rather are returned by the inmate. It is the undisputed testimony of the inmate witnesses that this procedure denies confidentiality of telephone calls for those inmates who are double-celled. The only inmate who testified regarding a possible remedy for this indicated that a telephone with a long enough phone cord to enable the inmate to go to the back of his cell and away from his cellmate, much like that employed in the old F–Block, would be sufficient to gain privacy.

19. Despite the philosophy of complete non-contact, there are a multitude of instances where inmates come in contact with others. These include, but are not limited to, the following situations:

A. *Contact With Other Inmates*

i. As mentioned earlier, most death row inmates are double-celled. Obviously contact with cellmates occurs on a regular basis.

ii. Death row inmates use the shower facility four at a time.

iii. Death row inmates use the exercise yard four or five at a time.

iv. Two death row inmates are law clerks in the H–Unit law library. These inmates come in contact with other inmates on a regular basis, both making rounds of the cells for requests for law books and in the law library itself, where they pick up and deliver materials to the individual inmates' cubicles. Aside from the law clerks, inmates have limited contact with other inmates on the trip to and from the library and in the law library, where they are positioned in separate wire-caged cubicles.

v. Ten inmates are permitted contact with each other during religious services.

vi. Four prisoners sweep the run daily which gives them unlimited and unrestrained access to the restricted area with mops and/or brooms.

vii. There is a barber shop at the outside end of H–Unit and the barbers are also death row inmates. The barber shop has a window through which CO's may observe.

B. *Inmate Contact With Staff*

i. In the H–Unit law library, inmates have contact with two correctional officers, a civilian librarian, and the two inmate law clerks.

ii. Any movement off the restricted area requires an escort by staff.

iii. Staff occasionally enter cells when an inmate is moved to another cell or for other reasons.

iv. Medical attention obviously requires contact with the medical personnel of the prison.

v. Psychological evaluation and counselling with the prison personnel requires contact visits.

vi. There are three chaplains employed by the prison, one full-time and two part-time. These chaplains are permitted to talk with inmates through their cell doors and there is a weekly church service at which inmates are placed, ten at a time, in a cell and the chaplain is then permitted to come and speak with the inmates through open bars.

vii. Disciplinary hearings, mandated by DOC policy, occur in full-contact settings between the inmate and certain staff members.

## C. *General Public*

i. Public tours through H–Unit are not unusual. On more than one occasion, these tours have come through the law library where the two law clerks mentioned above are working without restraint and with full access to a door opening to the public-access portion of the prison.

ii. Likewise, these same law clerks are frequently alone in the law library with the civilian female librarian. This occurs when the two CO's regularly on duty are accompanying shifts of prisoners in or out of the library.

iii. Although all prison employees testifying at trial denied any knowledge thereof, it is undisputed that on at least two occasions, and probably many more, law enforcement personnel from various jurisdictions have been allowed to come into the prison and interview death row inmates for leads, information, confessions, etc., regarding unsolved crimes. These interviews take place in the Unit Manager's office in full-contact settings.

iv. It is undisputed that on at least one occasion a death row inmate who sought counselling from the staff psychologist was seen in a full-contact setting with both the staff psychologist and a woman whose status was never made clear to the prisoner. From the testimony of a later witness, the Court concludes that this woman was a summer intern in pursuit of an educational degree, who was assigned to observe the staff psychologist for a certain period of time.

v. In addition to the three staff chaplains mentioned above, there are over 100 volunteer chaplains of various denominations who go through a training program and are permitted access to the death row inmates. These volunteer chaplains perform services and conduct visits in the same way described for staff chaplains in ¶ B(vi), above.

vi. At the time this lawsuit was filed, the prison prevented any contact between death row inmates and psychologists or psychiatrists employed to assist them on appeal or post-conviction relief. This policy has since been changed, and these outside psychiatric and psychological professionals are now allowed full-contact settings with the prisoners.

## D. *Other Incidents of Contact*

i. In a situation which accurately falls in all three of the above categories, two inmates were taken from H–Unit to the old prison for baptism in the chapel there. They were accompanied by CO's and the chaplain and walked approximately one quarter mile from H–Unit to the chapel. One of the two had some difficulty walking and was not shackled at his ankles. This inmate was completely unrestrained at the time of his baptism and had full access to the other inmate, several prison staff, and the volunteer chaplain who assisted.

ii. Inmate Brewer was brought from H–Unit approximately one-quarter mile to the old F–Block visitation room for the purpose of giving his deposition in a civil case filed in Pittsburg County.

iii. Death row inmate Robin Parks was placed in full contact with representatives of the media and video-taped only days before execution. This was justified by "public interest."

20. Under the scheme of representation provided by the State of Oklahoma to indigent capital defendants, any death row inmate convicted in the State of Oklahoma in a county other than Oklahoma or Tulsa Counties most likely meets the lawyer responsible for post-conviction remedy for the first time after the his initial appeal of right has been denied. In other words, in 75 of Oklahoma's 77 counties, indigent defendants are represented by one lawyer at trial, another lawyer on direct appeal, and yet a third lawyer for post-conviction remedies.

21. Death row attorneys have a particular need to establish trust and communication, and to explore all avenues of possible trial error or mitigation prior to the federal habeas corpus petition, as any grounds not asserted in the first petition may be barred. *See McCleskey v. Zant*, 499 U.S. 467, ——, 111 S.Ct. 1454, 1468, 113 L.Ed.2d 517 (1991).

22. Much of the information helpful to a death row inmate on direct appeal or post-conviction motion involves mitigating circumstances and requires investigation into sometimes painful and emotional past acts or occurrences and certainly circumstances surrounding the inmate and his crime which are not easily divulged to strangers.

23. All witnesses agree that trust is the most important aspect of meaningful communication between attorney and client. Plaintiffs' witnesses maintained that trust could not be developed sufficiently in a non-contact setting. While defendants' witnesses never expressly disputed this, their testimony is that the setting provided, at least with the change noted in ¶ 17 (Plexiglas at eye level), is constitutionally sufficient for meaningful access to the Court by death row inmates.

24. The initial meetings between attorney and inmate and any meeting between an attorney and an inmate with special needs, for example, retarded, blind, deaf, or requesting waiver of appeal, are particularly difficult without full contact. This is not only because complete communication is facilitated by a full view of facial features and other body language, but also because the ability to touch and share objects encourages trust and deeper communication. Likewise, with the inmates with special problems, the attorney is often called upon to interpret documents or read them to the client, and full contact assists in this tandem review of documents, exhibits, transcripts, etc.

25. Expert witnesses who testified regarding death row inmate attorney visitation in Texas and Utah explained that the accommodations made in those two states are considerably more restrictive than the present situation at H–Unit. Indeed, in both states, the attorney-inmate visitation is completely non-contact with no opportunity for spontaneous passing of documents or shaking hands or any other touching. Instead, anything to be passed to or from the inmate is through the assistance of a correctional officer. In Texas, death row inmates are permitted only one telephone call every three months, which may be to the attorney or some other contact; all calls are monitored.

26. Death row inmates present no greater security risk than any other high-maximum security inmate. There is significant evidence that they present less of a management problem than many offenders convicted of less serious crimes. There are many persons who have been convicted of murder who are not on death row, who are allowed to work through the security classifications and/or levels and ultimately be released back into society. Policy in Oklahoma dictates that death row inmates remain at the same security level and with the same absence of privileges as long as they remain on death row, no matter what their institutional behavior. Institutional behavior is generally better for death row inmates because such behavior may be used as evidence in mitigation or commutation proceedings.

27. At least 9 states allow full-contact visits between death row inmates and their counsel (Plaintiffs' Ex. 86). No problems are reported in any of these jurisdictions.

28. Four female death row inmates are housed at Mabel Bassett Correctional Center in Oklahoma City, Oklahoma. This is a facility housing minimum, medium, and maximum security female inmates. An OIDS attorney representing two women housed on this death row has never been denied the opportunity to have full-contact visits with either one of them in 25–30 visits in the past two years.

29. The warden of Mabel Bassett testified that the visitation policy for all female inmates in restrictive housing, including death row inmates, is the same—that all visits are to be non-contact in the general visitation room, which provides a Plexiglas divider and telephone communication, unless it is necessary to exchange or review documents or any other thing, for which there is no provision in the general visitation room. In those cases, full-contact visits are allowed.

The Court concludes that while the policy may exist, it has not been followed in recent years, as the attorney with experience in female death row visitation indicated she only had to request contact visitation for it to occur.

30. There is no county jail in the State of Oklahoma which does not allow full-contact visits between counsel and any defendant accused in a capital murder case. This includes Oklahoma and Tulsa Counties, where counsel are provided by the Oklahoma or Tulsa County Public Defender's Office who follow their clients through direct appeal and post-conviction motions. Thus, upon conviction, these inmates are completely familiar with their lawyers and the staff of the Public Defender's Office itself by the time they get to H–Unit.

31. There was an asserted agreement among counsel in this case that the plaintiff inmates and other subpoenaed inmates, who had all sought and obtained, without objection, writs of habeas corpus ad testificandum, would be transported the morning of trial from OSP at McAlester to Oklahoma City by agreement, the custodian to collect the original writs upon arrival in Oklahoma City. Despite this agreement, these inmates remained in their cells in McAlester, approximately three hours away from Oklahoma City, at the time the trial was scheduled to begin. Further, the Court issued an order, again by agreement of counsel, directing prison officials to allow two experts retained by plaintiff class to tour the facility and have access to information helpful in forming their opinions. The Court ordered defendants, their agents and employees "to cooperate, facilitate and assist in the inspection tour." (Order Permitting Inspection at 2 (June 14, 1993)). One of these experts testified that an attorney for DOC who accompanied them on this tour prevented either expert from speaking with inmates, for the reason that, while the Court ordered a tour, the Court did not specifically order that the experts could talk to inmates, and thus it would not be allowed. The Court, despite limited inquiry, did not determine the individual responsible for either of these incidents, and plaintiffs' counsel did not follow-up in further inquiry or re-quest any action by the Court. The Court is satisfied that counsel for defendants acted in good faith and are not at fault for any miscommunication. The Court observes these incidents as important facts, combined with (1) the total absence of any institutional planning to accommodate confidential attorney visitation in H–Unit, (2) the apparent hostility by prison employees to OIDS attorneys throughout the testimony, and (3) the inconsistent application of the non-contact policy. Together, these facts compel a finding that OSP maintains an institutionally sanctioned attitude of hostility and opposition to attorneys who attempt to represent death row inmates. While this attitude may have been prompted by acts of a specific OIDS attorney, the offending attorney is no longer employed by OIDS, or representing clients in the State of Oklahoma. In any event, were an individual attorney to knowingly violate prison rules or policy, the prison administrators have shown their willingness to undertake a remedy for specific misconduct on the part of one attorney (Plaintiffs' Ex. 34), which certainly they have a right, even a duty to do. It appears that discretion, reasonableness, and fair evaluation by prison administrators regarding attorneys' requests and judgments on behalf of their clients is seriously lacking. The blanket adversarial position taken against OIDS attorneys representing death row inmates is apparent on this record and is unjustified.

*Conclusions of Law*

An inmate does not forfeit all of his constitutional rights by the fact he or she has been convicted of a crime and imprisoned. *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979) (citing *Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. 119, 129, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977)), *abrogation on other grounds recognized by Medina v. O'Neill,* 838 F.2d 800, 803 & n. 25 (5th Cir.1988). Federal courts are required to take cognizance of the constitutional rights retained by prison inmates. *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974), *overruled on other grounds, Thornburgh v. Abbott,* 490 U.S. 401, 413–14, 109 S.Ct. 1874, 1881–82, 104 L.Ed.2d 459

(1989). The Fourteenth Amendment to the United States Constitution guarantees prisoners "adequate, effective, and meaningful" access to the courts. *Bounds v. Smith,* 430 U.S. 817, 822, 97 S.Ct. 1491, 1495, 52 L.Ed.2d 72 (1977). The right of meaningful access to the courts "is the most fundamental right he or she holds." *DeMallory v. Cullen,* 855 F.2d 442, 446 (7th Cir.1988) (citing *Adams v. Carlson,* 488 F.2d 619, 630 (7th Cir.1973)). Access to counsel is not only a right under the Sixth Amendment, but is one means of insuring adequate, effective, and meaningful access to the courts. *See Adams v. Carlson,* 488 F.2d at 632–33. "[A]n inmate's opportunity to confer with counsel is a particularly important constitutional right which the courts will not permit to be unnecessarily abridged." *Dreher v. Sielaff,* 636 F.2d 1141, 1146 (7th Cir.1980).

These principles do not require unfettered exercise of all retained constitutional rights. Indeed, " '[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights,· a retraction justified by the considerations underlying our penal system.' " *Bell v. Wolfish,* 441 U.S. at 545–46, 99 S.Ct. at 1877 (quoting *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948)). For example, there is no doubt that prison officials may permissibly prevent attorney visitation in the case of attorney misconduct. "While prisoners have a general right to consult with their legal counsel, that right is not absolute and correctional officials may prohibit disruptive attorneys from their institutions." *McMaster v. Pung,* 984 F.2d 948, 953 (8th Cir.1993) (citing *Lynott v. Henderson,* 610 F.2d 340, 342 n. 1 (5th Cir. 1980) and *Cruz v. Beto,* 603 F.2d 1178, 1185 (5th Cir.1979)). When a conflict arises between stated penological objectives and retained constitutional rights, the " 'federal courts will discharge their duty to protect [the] constitutional rights.' " *Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987) (quoting *Procunier v. Martinez,* 416 U.S. at 405–06, 94 S.Ct. at 1807–08).

Prison officials are charged with preserving the essential goals of institutional security, order, and discipline. *Bell v. Wolfish,* 441 U.S. at 546, 99 S.Ct. at 1877–78. When prison regulations interfere with an inmate's exercise of a retained constitutional right, the regulation "must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." *Id.* at 547, 99 S.Ct. at 1878 (citing *Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. at 129, 97 S.Ct. at 2539). When doing so, it must be remembered that " 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' " *Turner v. Safley,* 482 U.S. at 84, 107 S.Ct. at 2259 (quoting *Procunier v. Martinez,* 416 U.S. at 405, 94 S.Ct. at 1807).

Corrections officials' policies are entitled to great deference:

[J]udgments regarding prison security "are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."

*Turner v. Safley,* 482 U.S. at 86, 107 S.Ct. at 2260 (quoting *Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974)). "[J]udicial deference to prison security measures extends to 'prophylactic or preventive measures '...' [but] does not insulate from review actions taken in bad faith and for no legitimate purpose....' " *Goff v. Nix,* 803 F.2d 358, 362 (8th Cir.1986) (quoting *Whitley v. Albers,* 475 U.S. 312, 322, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986)), *cert. denied,* 484 U.S. 835, 108 S.Ct. 115, 98 L.Ed.2d 73 (1987). The deference required of this Court to prison administrations' judgments is great, but should not be too far reaching. As noted by another court, "just as a court decree intrudes upon judgments made by prison administrat[ors] concerning the area of their responsibility, a failure of the court to act, premised on undue deference, permits prison authorities to make judgments of a constitutional character." *Sample v. Borg,* 675 F.Supp. 574, 577–78 n. 12 (E.D.Cal.1987), *judgment vacated as*

*moot*, 870 F.2d 563 (9th Cir.1989). In this light, a prison regulation that conflicts with a retained constitutional right "is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. at 89, 107 S.Ct. at 2261.

The questions presented in this case are whether defendants' regulation prohibiting full contact visits between plaintiffs and their personal attorneys (1) infringes upon a retained constitutional right, and, if so, (2) whether the offending regulation is nevertheless permissible as it is reasonably related to legitimate penological interests.

The Supreme Court has not addressed the question present in this case—whether the constitution requires that a prison inmate be provided with full-contact attorney visits. Two circuit courts have addressed whether inmates must be provided contact visits with attorneys and have answered the question affirmatively. In *Ching v. Lewis*, 895 F.2d 608 (9th Cir.1990) (per curiam), the court held that "the [F]ourteenth [A]mendment guarantees prisoners meaningful access to the courts," and that meaningful access meant contact visits with attorneys. *Id.* at 609 (citing *Bounds v. Smith*, 430 U.S. at 822, 97 S.Ct. at 1495)). The court held that "[the] apparently arbitrary policy of denying a prisoner contact visits with his attorney prohibits effective attorney-client communication and unnecessarily abridges the prisoner's right to meaningful access to the courts." 895 F.2d at 610 (citing *Dreher v. Sielaff*, 636 F.2d at 1143). *Ching* does not address what level of contact is required. The brief factual background in *Ching* indicates that prison officials were only permitting the inmate to yell through a hole in the glass to his attorney. 895 F.2d at 609.

The Seventh Circuit suggests by dictum in *Dreher* that prohibiting attorney-client contact visits was impermissible, but reversed the district court's similar summary judgment ruling with instructions to the district court to take evidence and determine a constitutionally acceptable visitation plan. *Id.* at 1144. It is not clear exactly what visitation facilities were available to attorneys and inmates in *Dreher*, but it is clear they were thought to be inadequate. *Id.* at 1144–45.

Some contact might have been occurring, as the case mentions that prison guards were examining materials exchanged by the attorney and inmate. *Id.* at 1144. The court suggested that the district judge have prison officials prepare a plan providing "adequate attorney-client interview facilities." Nothing in the case suggests what level of contact was contemplated.

In *Adams v. Carlson*, 488 F.2d 619 (7th Cir.1973), prison officials required attorneys and inmates to visit through a glass partition by using telephones. In criticizing this arrangement, the court wrote that to justify such an infringement on attorney-client visitation, the "prison warden must come forward with facts which tend to support a reasonable suspicion not only that contraband is being smuggled to inmates in the face of established preventive measures, but that their attorneys are engaged in smuggling." *Id.* at 631–32.

Although one district court has found *no* right to contact visits, *Jeffries v. Reed*, 631 F.Supp. 1212, 1218–19 (E.D.Wash.1986), this Court concludes that plaintiffs are constitutionally entitled to contact visits with their attorneys. The level or nature of the contact is a different question. This Court is unaware of any other reported decision discussing the level of contact *minimally* required to protect plaintiffs' constitutional rights. The question thus becomes whether the present system, providing some contact, satisfies the requirement of providing adequate, effective, and meaningful access to the courts. If the present system infringes on the constitutionally required level of contact, it cannot be continued unless the defendants can offer a valid and rational connection between their visitation policy and legitimate security concerns, and that such policy complies with the four factor analysis established by *Turner v. Safley*, 482 U.S. at 89–90, 107 S.Ct. at 2261–62.

Were it necessary to resort to the *Turner* analysis, OSP would lose the battle. First, the Court is satisfied that there exists "substantial evidence in the record to indicate that the officials have exaggerated their response to [prison security] considerations" negating the judicial deference normally ac-

corded to such measures. *Id.* at 86, 107 S.Ct. at 2260. Moreover, the *Turner* analysis requires a finding of a rational connection between denial of contact and security concerns, as well as the absence of readily available alternatives. *Id.* at 89–91, 107 S.Ct. at 2261–63. Neither finding could be made on the facts presented here.

 However, as stated previously, the initial question is whether the visitation setting now provided at OSP prevents meaningful and effective access to courts. Assuming the installation of the clear barrier at eye level so that vision is not impeded, it does not. All of the concerns expressed by plaintiffs' witnesses are satisfied by the present visitation setting, with this change. Counsel and client would be able to shake hands, touch hands, speak freely with no distortion of voices, and see all nuances of facial expression and other non-verbal behavior without impediment. The development of trust and meaningful communication between client and counsel would not be hampered. There is no evidence supporting a conclusion that the relatively limited barriers would interfere with either a death row inmate's right to meaningful access to the court or his attorney's ability to render effective assistance of counsel. In this regard, the Court notes that no attorney testifying on behalf of the plaintiff class was of the opinion that he or she was unable to render effective representation under the present system; nor did any member of the plaintiff class opine that the present system prevented meaningful communication with the attorney. Indeed, as the inmate does not have full restraints during visitation in the present setting, it appears that the increased comfort to plaintiffs well offsets any limitation of contact in fostering communication, trust, and the ability to discuss sensitive subjects.[2]

 This Court concludes that while the constitutional right of meaningful access to the courts includes, in the case of death row inmates, contact visitation with counsel, the nature and extent of that contact may be limited by prison officials so long as meaningful communication is not impeded. The Court is concerned, primarily for the reasons illustrated by Finding of Fact ¶ 31, above, that in those occasional circumstances where meaningful communication may not be possible without full contact between client and counsel, prison officials will refuse to accede to a request of counsel or inmate, and will stubbornly cling to this approval of present conditions, or at least the lack of disapproval of the present visitation policy. The Court reiterates that the present policy is adequate because meaningful communication with counsel, and therefore access to the courts, is not impeded. In those situations, none of which have been presented in this lawsuit, where meaningful communication cannot reasonably be accomplished without full contact, the present visitation setting will not be constitutionally sufficient. As mentioned earlier, an impaired inmate, for example, mentally retarded or hearing impaired, could well need the removal of any barriers to achieve meaningful communication. It appears that prison officials are able to and have in the past applied the visitation policy inconsistently to accommodate judgment calls outside the letter of prison regulations.[3] In short, while the present setting, with the replacement window, is not constitutionally impermissible, it may well be under certain circumstances. The Court will not allow prison officials the ability to refuse full contact visits without consideration of special circumstances and inmates with special needs. Provision for exceptions to the general limited contact policy exists in the attorney visitation policy, OSP-090118-03, effective May 12, 1993 (Plaintiffs' Ex. 11) ("Any exception to the non-contact or limited contact setting must be authorized by the Warden" (¶ I.C.); "The visitor may appeal any limitation or denial by the Warden of visitation rights. . . . The inmate affected may appeal. . . ." (¶ IV.D.)).

---

**2.** The Court had extensive opportunity to observe the representative plaintiffs with full restraints during trial.

**3.** At Mabel Bassett Correctional Center, the letter of the rule is largely ignored for death row inmates; likewise, at OSP, Bob Ravitz, Public Defender for Oklahoma County, testified he was completely confident he could obtain a full-contact visit at OSP if he showed justification to the proper prison authorities.

There is no longer any dispute that the present setting for attorney visitation of death row inmates is completely confidential. The remaining complaint of the plaintiff class is that telephone conversations with counsel are not confidential due to double-celling. The State appears to have taken the position that confidential telephone calls are not required because confidential attorney visitation is. In these days of ever-increasing cost to the taxpaying public for the provision of legal services to indigent defendants, it appears a far-better position to encourage telephone and mail communication to save costs, where possible. While this Court is not empowered to impose its notions of common sense on prison administrators, it can insure that double-celled inmates are not punished by the removal of confidential attorney telephone calls merely by their status as cellmates. Particularly when McAlester, and thus OSP, is over three hours by car from the OIDS attorneys and the Oklahoma County Public Defender, and several states away from one volunteer attorney who represents inmate Foster (see Charles Foster's Emergency Motion to Intervene (May 20, 1992)), an inference can reasonably be drawn from the evidence that many if not most attorney-client communications take place by telephone. Thus, meaningful access to the courts, in a remote location like OSP, requires confidential telephone communication. The prison authorities have changed most of the existing telephone practices at H–Unit in order to accommodate the inmates' needs for unmonitored and uninterrupted telephone conversations with counsel.[4] The only remaining dispute is that the confidentiality of the call may not be guaranteed with the presence of a cellmate. Having found a constitutional right to confidential attorney telephone communication and a restriction of the prison on such communications, the Court looks to *Turner v. Safley*, 482 U.S. at 89–90, 107 S.Ct. at 2261–62, to determine if the balancing test permits such infringement. Under this test, the Court finds there is a rational connection between the policy regarding telephone use and penological interest. Obviously, inmates cannot be allowed unfettered access to telephone communication with the outside. It is fair and necessary for the rights of other inmates and the public for prison officials to impose limitations on telephone use. While there is an alternative means of exercising the right, in that attorney visitation is permissible, the Court has found that this alternative is not cost-effective for either the inmates or the public. The third consideration is whether accommodation of the right will have an impact on prison resources and other inmates, and the Court concludes it will. If guards are required to escort inmates to a telephone or if every inmate is allowed unrestricted access to the telephone, a significant affect on both staff and inmates would result. There is no readily available alternative which has been suggested by either plaintiffs or counsel other than the installation of a long cord between the base unit and receiver so that the inmate could take the receiver to the back of the cell and achieve privacy from his cellmate. Prison officials indicated their willingness to comply with this suggestion at the time of trial. Thus, with this change, the telephone policy as it presently exists or will exist, if a new telephone line becomes available to the prison, passes constitutional muster.

*Conclusion*

In accordance with the foregoing, the Court finds that all defendants in their individual capacities are entitled to judgment as a matter of law. Defendant Sanders is entitled to judgment for all purposes.

Further, the Court finds that limited contact attorney visitation as presently provided, with the change ordered below, allows meaningful access to the Court and effective assistance of counsel and does not violate any constitutional rights of the plaintiff class; provided, however, that prison administrators must allow exceptions when necessary and/or advisable. Although confidential at-

---

**4.** The original H–Unit telephone procedure applied to *all* calls, which were monitored and terminated electronically after 15 minutes. The prison has tried but is unable to get an additional line to be devoted only to attorney calls. Until that line is installed, OSP has eliminated the monitoring and automatic termination for all calls.

torney telephone calls are slightly impaired, with the change ordered below, the procedure is not violative of constitutional rights.

Plaintiffs are entitled to relief in two particulars: First, defendants shall be required to place Plexiglas or another clear divider at eye level in the metal grate, large enough to enable full vision but small enough to avoid impeding verbal communication through the grate; second, defendants shall place a cord on telephones used for confidential attorney phone calls, which is long enough to enable the inmate to take the receiver to the back of the cell. These changes shall be made and verified to the Court no later than August 2, 1993.

A declaratory judgment and injunction shall be issued consistent with these conclusions.

All execution dates presently set for any member of the plaintiff class are hereby stayed. This stay shall continue in effect until the changes ordered herein have been made and verified. A separate order of stay will be filed simultaneously with this opinion and judgment, and the Clerk is directed to serve a certified copy of the order of stay on Warden Reynolds. 22 Okla.Stat. § 1001.1 (1993 Supp.) defines the circumstances under which the Oklahoma Court of Criminal Appeals shall set execution dates once the stays are vacated.

IT IS SO ORDERED.

## ORDER STAYING EXECUTIONS

Consistent with the Memorandum Opinion and Judgment entered this day, the Court hereby orders stays of execution dates presently set for class members Malcolm Rent Johnson, Richard Rojem, Phillip Dewitt Smith, and Sammy Van Woundenberg. Each of the named inmates, according to pleadings filed in this case, has had an execution date set which is more than sixty days from the date from which relief, that is modifications to the present attorney visitation procedure, is to be completed. Stays for all other members of the plaintiff class for which execution dates have been set have previously been entered.

IT IS THEREFORE ORDERED that the execution dates previously established for plaintiff class members Malcolm Rent Johnson, Richard Rojem, Phillip Dewitt Smith, and Sammy Van Woundenberg are stayed pending completion of modifications as ordered. This Court will enter an order vacating the stays upon completion of the required modifications, whereupon the Attorney General may apply to the Oklahoma Court of Criminal Appeals for resetting of dates as provided in 22 Okla.Stat. § 1001.1 (1993 Supp.).

The Clerk is directed to serve a certified copy of this order by certified mail to Oklahoma State Penitentiary Warden Dan Reynolds.

IT IS SO ORDERED.

## JUDGMENT

In accordance with the Memorandum Opinion filed this date, the Court is of the opinion and therefore declares, pursuant to plaintiffs' request for declaratory judgment, that non-contact visitation between attorneys and death row inmates is violative of the Sixth and Fourteenth Amendments to the United States Constitution. It is further declared that full contact visitation without limitation between death row inmates and their attorneys is not mandated by the Sixth or Fourteenth Amendments to the United States Constitution. It is further declared that the visitation setting provided by defendants to attorneys visiting death row inmates which will exist following the modifications ordered below is constitutionally permissible and provides sufficient contact for attorneys to effectively represent their clients and for the clients to have meaningful and effective access to the Courts, provided exceptions are made when necessary. It is further declared and decreed that at Oklahoma State Penitentiary in McAlester confidential attorney phone calls are constitutionally required but may legitimately be limited by the needs of prison personnel and other inmates and, with the modification ordered below, are presently acceptable.

IT IS THEREFORE ORDERED AND ADJUDGED that defendants, in their official capacities, are to install a Plexiglas or other

clear window in the visitation room grate sufficient to allow eye contact and full unimpeded vision, but not so great as to impede verbal communication.

IT IS FURTHER ORDERED AND ADJUDGED that a cord between the receiver and base unit of the telephone(s) used for attorney phone calls be sufficiently long that any inmate may take the receiver to the back of his cell to achieve privacy from his cellmate.

IT IS FURTHER ORDERED AND ADJUDGED that all execution dates presently set are stayed until compliance with this order. The Court will vacate the stays by written order upon compliance with injunctive relief.

IT IS FURTHER ORDERED AND ADJUDGED that judgment is granted to all defendants in their individual capacities and to defendant Robert Sanders for all purposes.

## ORDER ON MOTION FOR NEW TRIAL OR TO AMEND

Plaintiff class has filed an Alternative Motion for New Trial or to Alter or Amend the Judgment in which it once again argues evidence outside the record and previously presented legal argument. A supplement has been read and considered. The motion for new trial is denied. Insofar as the motion presents a request for alteration of the judgment, the Court is in agreement that the language in the Order Staying Execution, filed July 21, 1993, indicated that each of the named inmates had an execution date set "more than sixty days" from the date relief under the Court's order would be completed. This language constitutes a clerical error, as the execution dates were "less than sixty days" from the date of compliance with the Court's prospective injunctive relief. To this extent, plaintiff class's motion to alter or amend [order saying execution] is granted.

 In all other respects, the motion of the plaintiff class is denied. The Court construes 22 Okla.Stat. § 1001.1 (1993 Supp.) to require the Court of Criminal Appeals to set an execution date no sooner than sixty days from the dissolution of the Order Staying Execution, entered contemporaneously herewith. See 22 Okla.Stat. § 1001.1(D). Thus, it has been the Court's assumption with which counsel have apparently concurred, that, upon dissolution of the Order Staying Execution, the Court of Criminal Appeals is prohibited by statute from setting execution dates within sixty days of that order. This statute has been the source of this Court's allowance of an additional sixty days beyond compliance with the order granting relief. The argument of the plaintiff class to the contrary is not persuasive. The other considerations urged by plaintiff class are outside the scope of the issues in this suit and are more appropriately argued in other courts.

In accordance with the foregoing, plaintiff class's Alternative Motion for New Trial or to Alter or Amend the Judgment is denied in all respects except the Court's Order Staying Execution is amended so that the erroneous description of the execution dates as "more than sixty days" from the date from which relief could be completed is corrected to read "less than sixty days." In all other respects, the motion is denied.

IT IS SO ORDERED.

## ORDER ON COMPLIANCE

In compliance with the Court's order and judgment entered July 21, 1993, defendants filed their "Notice to the Court," in which they allege compliance with the prospective injunctive relief granted. Plaintiffs have objected to the statement of compliance and, pursuant to the Court's order, defendants have replied regarding certain issues.

The Court's findings and conclusions indicated that the telephone system presently in use, whether replaced by an outside line or not, was in compliance with constitutional requirements. OSP voluntarily removed security from those lines so that they are not monitored and/or limited in length. The prison is presently negotiating for the addition of telephone lines so that regular prison phones may be placed back on the security system and attorney/client lines will bypass the system. Of course, this method is far more beneficial to prison security and admin-

istration than for the plaintiff class; however, the Court's finding that either system satisfies confidentiality (with the addition of a lengthened telephone cord) will not be modified. Thus, defendants are in full compliance with the Court's judgment.

Next, plaintiff class agrees that a hard plastic window has been inserted into the grate which greatly increases visual perception. This is what the Court's judgment ordered. Now, the plaintiff class complains that acoustics are impinged by the hard plastic window and they seek the addition of soundproofing material. Again, there was no evidence presented at trial and installation of soundproofing was not part of this Court's judgment. Defendants in their response indicate a willingness to and plan for inserting soundproofing material.

In objecting to defendants' compliance with the Court's order, plaintiff class goes outside the Court's order to request relief that was not sought and upon which evidence was not heard. The objection is overruled; the Court considers defendants to be in full compliance with its order and judgment; and, as reflected in a separate order, all stays of execution previously entered are vacated.

In accordance with the foregoing, the Court finds defendants in compliance with the Court's judgment and the objection of plaintiff class is overruled.

IT IS SO ORDERED.

## ORDER VACATING STAYS OF EXECUTION

Having ruled on relevant post-trial motions and having approved the modifications made at OSP in compliance with the Court's opinion and judgment of July 21, 1993, the Court hereby vacates and dissolves all stays of execution previously entered in this case.

IT IS SO ORDERED.