**Ronnie BRUSCINO, et al., on behalf of themselves and others similarly situated, Plaintiffs–Appellants,**

v.

**Norman CARLSON, et al., Defendants–Appellees.**

**Nos. 87–1683, 87–1943.**

United States Court of Appeals, Seventh Circuit.

Argued April 1, 1988.

Decided July 22, 1988.

Rehearing and Rehearing En Banc Denied Nov. 4, 1988.

---

Nancy Emmet Horgan, Howard B. Eisenberg, S.I.U. Legal Clinic, Carbondale, Ill., for plaintiffs-appellants.

Frederick J. Hess, U.S. Atty., East St. Louis, Ill., for defendants-appellees.

Before BAUER, Chief Judge, and POSNER and FLAUM, Circuit Judges.

POSNER, Circuit Judge.

The United States Penitentiary in Marion, Illinois, is the successor to Alcatraz as the prison designed to hold the most violent and dangerous prisoners in the federal system. The only "Level 6" prison in that

system (federal prisons carry a security rating ranging from 1 to 6), it may be the most severe prison in the country, and it houses not only the worst federal prisoners but, on a contract basis, state prisoners too violent for state prisons to handle. Its 300–odd inmates are among the most dangerous people in this nation of 240 million. In 1983, one-third of Marion's inmates were serving terms either of life or of 70 years or more; in 1985, 40 percent were serving time for murder, manslaughter, or assault with intent to kill. Because there is no death penalty for committing crimes in federal prisons (even murder), and because evolving notions of due process and of cruel and unusual punishment limit the ability of correctional officers to prevent or deter prison violence, the control of these inmates presents a formidable problem indeed.

Before us is an appeal from the denial of injunctive relief, after extensive evidentiary hearings before a federal magistrate and a federal district judge, in a class action on behalf of all of Marion's inmates, comprehensively challenging the operations of the prison as violating the Constitution's guarantees of due process, access to the courts, religious freedom, and freedom from cruel and unusual punishments, 654 F.Supp. 609. The focus of the suit is the procedures that the prison adopted in the wake of a crescendo of violence in October 1983, violence that included the murder of two guards and an inmate. These procedures, the plaintiffs argue, have made the conditions of confinement at Marion so savage and brutal as to constitute cruel and unusual punishment; alternatively, even if the conditions do not violate Eighth Amendment norms of civilized punishment they are so much harsher than those prevailing in any other federal prison, even Level 5 prisons such as Leavenworth, that assignments to Marion are actual (albeit incremental) deprivations of liberty and are therefore unconstitutional unless made after notice to the inmate and an opportunity for at least a minimal hearing. The district court dismissed on summary judgment an earlier suit attacking the conditions created by the "permanent lockdown" that began

in 1983; we affirmed in part and reversed in part. See *Caldwell v. Miller,* 790 F.2d 589 (7th Cir.1986). The present case, as mentioned, was decided after extensive evidentiary hearings.

As a result of the permanent lockdown, each inmate at Marion is confined to a one-man cell (there are no female inmates in the prison) round the clock, except for brief periods outside the cell for recreation (between 7 and 11 hours a week), for a shower, for a visit to the infirmary, to the law library, etc. (Some inmates have more time outside the cell, as we shall see.) Recreation means pacing in a small enclosure—sometimes just in the corridor between the rows of cells. The inmate is fed in his cell, on a tray shoved in between the bars. The cells are modern and roomy and contain a television set as well as a bed, toilet, and sink, but there is no other furniture and when an inmate is outside his cell he is handcuffed and a box is placed over the handcuffs to prevent the lock from being picked; his legs may also be shackled. Inmates are forbidden to socialize with each other or to participate in group religious services. Inmates who throw food or otherwise misbehave in their cells are sometimes tied spread-eagled on their beds, often for hours at a stretch, while inmates returning to their cells are often (inmates of the control unit, always) subjected to a rectal search: a paramedic inserts a gloved finger into the inmate's rectum and feels around for a knife or other weapon or contraband.

■ To live under such conditions is sordid and horrible, and though they would have raised few eyebrows a hundred years ago, the concept of cruel and unusual punishments is an evolving one; the minimum standard of decency in prisons is a function of the conditions of life on the outside, and therefore as society becomes wealthier, more comfortable, more sensitive, more civilized, the constitutional minimum of decency in incarceration rises. *Davenport v. DeRobertis,* 844 F.2d 1310, 1314–15 (7th Cir.1988); see *Rhodes v. Chapman,* 452 U.S. 337, 346–47, 101 S.Ct. 2392, 2398–99, 69 L.Ed.2d 59 (1981). There is no question

that conditions in Marion deserve careful scrutiny, but they must be evaluated against the background of an extraordinary history of inmate violence and with proper regard for the limited competence of federal judges to micromanage prisons. Cf. *Duran v. Elrod,* 760 F.2d 756, 759 (7th Cir.1985), and cases cited there.

The defendants placed in the record a remarkable narrative of the violence that led up to the lockdown. We note a few highlights (some corroborated by decisions of this court). Two inmates, while exercising in the corridor outside their cells, garrotted a third inmate, who was asleep in his cell with his head against the bars. See *United States v. Silverstein,* 732 F.2d 1338 (7th Cir.1984). An inmate stabbed another inmate with a knife while they were exercising and was in turn stabbed by two inmates with knives on his way back to his cell. An inmate fired a zip gun (a homemade pistol) at another inmate and at a guard, wounding both. Inmates have attacked other inmates and guards with a homemade bomb, with a light bulb, with a padlock, with a sharpened pencil wielded as a knife, with a sharpened toothbrush, with feces, with a chair, with a mop wringer, with a home-made mallet, and with a bucket of boiling water, as well as with the usual zip guns and shanks. (Shanks are homemade knives, often carved out of the legs of the steel beds in the cells. The steel beds have now been replaced by concrete blocks in an effort to prevent the manufacture of shanks.) A number of inmates were killed in these assaults, and in addition there were frequent riots and strikes by inmates, takings of guards as hostages, takeovers of cell blocks, and ingenious attempts to escape—once to the accompaniment of rifle fire directed at the prison from the outside. One inmate managed to detonate a bomb in his cell.

In the climactic week that preceded the lockdown, two guards were murdered in similar incidents. In each a prisoner being escorted from his cell broke away from the three guards escorting him, thrust his handcuffed wrists (this was before the innovation of placing a box over the handcuffs) into an accomplice's cell, emerged sans handcuffs but holding a shank in his hand, and proceeded to attack the guards. In one of the incidents, another guard was crippled and the third seriously injured. See *United States v. Fountain,* 768 F.2d 790, modified on other grounds, 777 F.2d 345 (7th Cir.1985). Throughout this period, searches uncovered an astonishing quantity of knives, zip guns, and other contraband, including many homemade keys that fit handcuffs and others that fit doors in the prison. Searches of body cavities, including the nose, the mouth, and the rectum, continue to turn up an impressive quantity and variety of contraband, including knives and hacksaw blades.

The incidence of violence has declined since the lockdown. It appears that in the four and a half years since, "only" 3 murders have been committed, while in the four preceding years 11 murders—almost four times as many in a shorter time than has elapsed since the lockdown—had been committed. In the nine months following the adoption of the new procedures the number of armed assaults by inmates declined (in comparison to the preceding nine months) from 19 to 8, although the number of unarmed assaults rose (from 7 to 18). See *The United States Penitentiary, Marion, Illinois: Consultants' Report Submitted to H.R. Comm. on Judiciary,* 98th Cong., 2d Sess., ser. 21, p. 20 (Comm. Print Dec. 1984). If the comparison is broadened to approximately the four years before and four years after the lockdown, the number of armed assaults fell from 115 to 34 and the number of unarmed assaults was unchanged at 53 (Bureau of Prisons statistics). Since the principal victims of murders and armed assaults in Marion penitentiary are inmates, the procedures that the plaintiffs describe as cruel and unusual punishment are the very procedures that are protecting them from murderous attacks by fellow prisoners.

■ If order could be maintained in Marion without resort to the harsh methods attacked in this lawsuit, the plaintiffs would have a stronger argument that the methods were indeed cruel and unusual punishments. But the plaintiffs' able coun-

sel have no suggestions as to how this might be done. Cf. *Duckworth v. Franzen*, 780 F.2d 645, 655 (7th Cir.1985). They do not acknowledge the difficulty of controlling inmates who, since they have no expectation of ever being released from prison and are in no danger of being executed, cannot be deterred by threat of punishment from trying to kill and maim the inmates and guards who displease them, or to escape, or to destroy prison property. The plaintiffs argue that it is the conditions at Marion before the lockdown that brutalized the inmates and caused them to become so violent and destructive. This is rank conjecture and implausible to boot. Few inmates are assigned to Marion who do not have a substantial history of violence in prison; it is not likely that these wolves would have turned into sheep if Marion had been a gentler place.

Father Daniel Berrigan in an amicus curiae brief urges that Marion be "dismantled," if necessary by "illegal means." That is neither a responsible nor a constructive suggestion. If Marion were "dismantled," its inmates would have to be transferred to less secure prisons (which might then become more like Marion). If it were "opened up"—if conditions as they existed in October 1983 were restored—the lives and safety of the inmates and guards would be in grave jeopardy. The current conditions, ghastly as they are, testify in a weird way to our nation's aspirations to a humane criminal justice system, for they result from forbidding murderous inmates to be executed or to be killed or beat senseless by outraged guards; no inmate has been killed at Marion save by another inmate.

■ Taken one by one, each condition of which the plaintiffs complain is within constitutional limits. The amount of time that inmates are allowed to spend outside their cells is within guidelines recently discussed by this court. See *Davenport v. DeRobertis, supra*, 844 F.2d at 1315–16. The denial of opportunities for socialization and for group religious services has been upheld in previous decisions as well, and in circumstances less desperate than those revealed by the record of this case (a record that fills the gap that induced us to remand a similar issue in *Caldwell v. Miller, supra*, 790 F.2d at 599–600, for factual exploration). See, e.g., *O'Lone v. Estate of Shabazz*, —— U.S. ——, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987); *Turner v. Safley*, —— U.S. ——, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *Martin v. Tyson*, 845 F.2d 1451, 1455 (7th Cir.1988) (per curiam). The handcuffing, the shackling, the boxing of the handcuffs, the spread-eagling, and the rectal searches are reasonable measures in view of the history of violence at the prison and the incorrigible, undeterrable character of the inmates. *Bell v. Wolfish*, 441 U.S. 520, 558–60, 99 S.Ct. 1861, 1884–85, 60 L.Ed.2d 447 (1979), upheld rectal searches (albeit visual rather than, as here, manual) of pretrial detainees.

■ The whole is sometimes greater than the sum of the parts: the cumulative effect of the indignities, deprivations, and constraints to which inmates are subjected determines whether they are receiving cruel and unusual punishment. See, e.g., *French v. Owens*, 777 F.2d 1250, 1252 (7th Cir.1985). The whole here is depressing in the extreme, but we are not persuaded that any relaxation in the controls instituted in the fall of 1983 is constitutionally required, given the extraordinary security problems at the prison. The controls are a unitary and integrated system for dealing with the nation's least corrigible inmates; piecemeal dismantling would destroy the system's rationale and impair its efficacy.

■ The plaintiffs argue that the conditions of confinement at Marion are even worse than depicted above because guards frequently beat prisoners, conduct the rectal searches in an unnecessarily brutal, painful, and humiliating manner, and in general behave as lawlessly as the prisoners. These allegations aroused the interest of Amnesty International, which has criticized the management of the prison. And evidence was presented at trial to support the allegations. But the evidence consisted of testimony by inmates, who frequently lie in prisoner rights' cases, and the magistrate and district judge disbelieved their

testimony about misconduct by the prison staff. Maybe, as the plaintiffs urge, their witnesses were telling the truth, but we are in no position to question the resolution of issues of believability by those who saw and heard the witnesses testify. See *Bullard v. Sercon Corp.*, 846 F.2d 463, 466 (7th Cir.1988).

■ The other claims can be disposed of briefly. The plaintiffs complain that because of the extraordinary security procedures at Marion there are long delays in arranging for visits by lawyers with inmates who have pending litigation, that the ability of inmates to conduct legal research is inhibited by the fact that they are allowed to take out only three books at a time from the law library, that the indignity of having to submit to rectal searches discourages inmates from meeting with their lawyers or using the law library, that forbidding inmates to change prisons during the pendency of a lawsuit in the district where they are imprisoned discourages litigation by inmates of Marion (who naturally are eager to be transferred to other prisons in the federal prison system), and that as a result of all these discouragements and obstacles inmates at Marion are deterred from exercising their implied constitutional right to litigate (on which see, e.g., *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *Caldwell v. Miller, supra,* 790 F.2d at 605–07; *Hossman v. Spradlin,* 812 F.2d 1019 (7th Cir.1987) (per curiam); *In re Gee,* 815 F.2d 41 (7th Cir. 1987)). The short answer to this part of the plaintiffs' appeal is that the record in this case contains no evidence of any prejudice to an inmate in bringing or prosecuting a lawsuit. Such a showing is required in a case alleging a denial of access to the courts. *Hossman v. Spradlin, supra,* 812 F.2d at 1021 and n. 2. No one fell under the bar of a statute of limitations, no one failed to make a timely filing, no one was denied legal assistance to which he was entitled, no one lost a case he should or could have won.

■ The last issue is whether conditions at Marion are so harsh (even if not unconstitutionally so) because of the extraordi-nary security problems there that assignment to Marion should be treated as a deprivation of liberty and should therefore be subjected to the requirements of due process of law. A transfer from one prison to another does not deprive the prisoner of liberty or property within the meaning of the due process clause, and therefore does not require notice and an opportunity for a hearing. See, e.g., *Olim v. Wakinekona,* 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); *Caldwell v. Miller, supra,* 790 F.2d at 603. We applied this principle to transfers to Marion from other federal prisons in *Miller v. Henman,* 804 F.2d 421 (7th Cir.1986), which the plaintiffs ask us to overrule, pointing out that the record of the present case contains a fuller description of conditions at Marion since the lockdown. We naturally are reluctant to overrule a recent decision, and the difference in the factual records in the two cases is not a persuasive reason for doing so here. The principal question in *Miller* was not whether a transfer from a less harsh to a harsher prison triggers a right to due process because the transfer is an incremental deprivation of liberty, but whether the rules of the Bureau of Prisons create an entitlement of which the prisoner cannot be deprived without due process of law. To that question the actual harshness of conditions at Marion is irrelevant.

■ The plaintiffs urge another point, one that distinguishes between positive liberty (liberty rights conferred by law) and natural liberty. They argue that prisons deprive inmates of their natural liberty to varying degrees, and the incremental deprivation effected by a transfer to Marion is so great that it should count as an actionable deprivation of natural liberty. We disagree. Marion is not a homogeneous institution. Our description concentrated on the harshest units, but there are gentler ones, notably C unit, where prisoners are allowed out of their cells 22 hours a week, have some opportunities for work, and are allowed to socialize with the other prisoners in the unit. Conditions in C unit are apparently no more restrictive than in Level 5 prisons. Further, it would be illogical

to entitle inmates assigned to Marion to a hearing on the ground that Marion represents a quantum increase in restrictiveness, yet deny all other inmates in the federal system a similar right. There is no ground for thinking that the reassignment of an inmate from a Level 1 prison to a Level 5 prison effects a lesser deprivation of liberty than the reassignment of an inmate from a Level 5 prison to Marion.

The issue thus becomes whether we shall require the Bureau of Prisons to conduct a hearing before moving an inmate to any prison, or any unit within a prison, in which the conditions of confinement are appreciably more onerous or restrictive than where the inmate is now. Such a requirement would protect a few inmates who are assigned to Marion because of a mistaken belief that they are too violent or dangerous or escape-prone to remain where they are, but would also greatly complicate the administration of the federal prison system and be inconsistent with strong statements, that we are not free to ignore, by the Supreme Court. "The conviction [of a criminal defendant] has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons.... Confinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose. That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules." *Meachum v. Fano*, 427 U.S. 215, 224–25, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976) (emphasis in original).

The plaintiffs present other objections to the dismissal of their suit, but these need not detain us for long. In particular they argue that the magistrate should have recused himself for bias. They point to his action in resolving all credibility questions in favor of the defendants and to his lavish praise for their testimony. These points may create suspicion but they do not demonstrate bias. The

scope of appellate review of determinations of credibility is very limited and is not to be expanded by inferring bias from such tenuous indications as cited by the plaintiffs here. No other issue need be discussed; the judgment dismissing the suit is

AFFIRMED.