**Richard YOUNG, Plaintiff,**

v.

**David LARKIN, et al., Defendants.**

No. 3:CV–93–0247.

United States District Court, M.D. Pennsylvania.

Sept. 30, 1994.

Richard Young, pro se.

Amy Zapp, Office of Atty. Gen., Harrisburg, PA, for defendants.

### MEMORANDUM

VANASKIE, Judge.

Plaintiff Richard Young, a pretrial detainee in custody at the Lackawanna County Prison, but formerly incarcerated at the State Correctional Institution at Dallas–Pennsylvania ("SCI–Dallas"), filed the above-captioned civil rights action on February 19, 1993. This Memorandum and accompanying Order address defendants' motion to dismiss (Dkt. Entry # 7). For the reasons stated below, the defendants' motion to dismiss will be granted.[1]

### BACKGROUND

Young's suit, which he filed pursuant to 42 U.S.C. § 1983, complains about his treatment while housed as a pretrial detainee at SCI–Dallas between March 10, 1992 and July 15, 1992. (See "Complaint Civil Rights" (Dkt.

---

1. On September 10, 1993, Young filed a motion to compel discovery, which also is pending before the Court. (Dkt. Entry # 46.) In light of the decision to grant summary judgment in favor of defendants, Young's motion to compel will be denied as moot.

Entry # 1; hereafter "Compl.") at 1.) [2] The defendants include the Pennsylvania Department of Corrections (the "DOC"), the Commissioner of Corrections, Joseph Lehman, and the following SCI–Dallas officials: John R. Stepanik, Superintendent; David H. Larkins, Deputy Superintendent for Operations; Paul F. Crisler, Deputy Superintendent for Operations; Robert Pikulski, Counselor; and Stanley Gabriel, Major of the Guard. Young requests "monetary relief of $25,000 as a result of the defendants' actions...." (Compl. at 6.)

In March, 1992, the Court of Common Pleas of Lackawanna County ordered that Young, who was a pretrial detainee being held at the Lackawanna County Prison on murder charges, be transferred to SCI–Dallas because, as the court explained, "incarcerated at the Lackawanna County Prison [were] several potential witnesses against" Young and the "potential for witness intimidation and tampering" existed. (Stepanik Decl. at Ex. "II.") The form employed by the Pennsylvania Bureau of Correction, entitled "Transmittal Of Data For County Prison Transfer" accompanying Young's transfer to SCI–Dallas, indicated that no bail amount was set in connection with his murder charges. It also indicated that two detainers were filed against him, which involved, *inter alia,* arson and criminal mischief, for which each had bail set at $200,000. (Stepanik Decl. at Ex. "II.")

Upon Young's transfer, SCI–Dallas officials prepared a "Notification of Confinement," in which Young was advised:

You were received at SCI–Dallas as a [sic] untried/unsentenced county detentioner

(Lackawanna Co.). You are being placed in the Restricted Unit until you are seen by the Program Review Committee. [Stepanik Decl. at Ex. "II."] [3]

The next day, March 11, 1992, SCI–Dallas officials held an Administrative Custody Hearing concerning Young's confinement in a restricted housing unit, after which the officials recorded:

[Young is] an HVA from Lackawanna County who is a potential escape risk. Absconded from Public defender's office on prior charge.

SCI–Dallas records indicate that on March 12, 1992, two days after his transfer to SCI–Dallas, Young undertook a "hunger strike" and began to refuse eating his meals. (Stepanik Decl. at Ex. "VI.") Young consequently was confined to a psychiatric observation room between March 13 and March 23, 1992. (Stepanik Decl. at ¶ 37 and Ex. "VI.") [4]

On April 14, 1992, SCI–Dallas administrative officer George A. Matthews memorialized the following conversation in a memorandum he addressed "To Record:"

On April 14, 1992, Trooper Jerry DeFazio, Pennsylvania State Police, Dunmore, arrived at SCI–Dallas [and] substantially stated Young should be treated as an extreme security risk in that Young may attempt to get a medical emergency to a local hospital. He will then use it to fake a fall and file a lawsuit or make an escape attempt. It was told to me that his attorney was arrested for blocking a doorway while he made his getaway being a fugitive

---

2. Although Young remained incarcerated at SCI–Dallas until September 15, 1992, (*see* Ex. "X" attached to "Declaration of John R. Stepanik," SCI–Dallas superintendent, (hereafter "Stepanik Decl.") at Dkt. Entry # 18), his complaint clearly states that he "seeks damages for the plaintiff's [sic] actions ... from March 10, 1992 to July 15th, 1992." (Compl. at 1.) Young recently reaffirmed that his action is limited to the period encompassed by those dates. (Dkt. Entry # 59 at 1.)

3. Pennsylvania Bureau of Correction "Administrative Custody Procedures" define a Restricted Housing Unit ("RHU") as housing used, *inter alia,* "for the temporary housing of inmates

awaiting classification, transportation, or available cell space." (Stepanik Decl. at Ex. "I," pgs. 2–3.) Young's classification at SCI–Dallas was "HVA," or "held for various authorities." (Stepanik declaration at 6–7.)

4. Young would later assert to SCI–Dallas officials that he did not conduct a hunger strike, but was not eating because he had "a big hearing coming up." (DOC "Nursing Care Notes" dated Mar. 21, 1992, attached to Stepanik Decl. at Ex. "VII.") Young states in his filings that the "Defendants placed the Plaintiff in a cell in the hospital in isolation with a concrete bed—on the floor—no cover and no hot water." (Dkt. Entry # 49 at 3.)

for eight (8) years. [Stepanik Decl. at Ex. "VIII."]

Because Young was housed in administrative custody, Pennsylvania Bureau of Corrections procedures provided that he was entitled to have his housing status reviewed, and to be personally interviewed as part of the review, every thirty (30) days by a Program Review Committee ("PRC"). (Stepanik Decl. at Ex. "I," pg. 4.) A progress review was conducted on April 9, 1992. The PRC issued, in substantial part, the following report:

> Young requested visiting privileges in the Visiting Room based on the fact that he needs the time to sit with his lawyers in an unhandcuffed fashion and of not being a threat to other people who were possible witnesses in the county. Young now states that witnesses he was to be separated from are no longer being potential witness and that those cases have been dropped. PRC advised him they would, in fact, contact the Lackawanna officials to find out more about this situation. PRC also has the understanding that he may have been a potential escape risk to which Young claimed he had never been convicted of any similar charges, and that information we have is wrong. He requested a telephone call and discussed this with Mr. Kaminski. Mr. Rusnak, Records Office Supervisor, will be contacted to find out the specifics in Young's case. If, in fact, the inmates we are separating him from are no longer at Lackawanna Prison or that the potential for problems there no longer exists, the Records Officer should try to get him transferred him [sic] back to that institution. He was agreeable to this. [Stepanik Decl. at Ex. "V."] [5]

Young refused to attend his next PRC review. The May 14, 1992 PRC review report, in pertinent part, stated:

> Young was scheduled for his 30 day review on this date before the PRC. Young re-

fused to attend. By way of this communication, Young is strongly encouraged to attend his next regularly scheduled review.... He is being continued in the RHU as he is considered a potential escape risk because of his past history. It is also noted that he is being held for Lackawanna County Prison as a HVA. He will continue on that status until he is returned to the county or returned to other authorities. [Stepanik Decl. at Ex. "V."] [6]

The June 11, 1992 PRC review report, in pertinent part, stated:

> There was a significant discussion about his status and his inability to obtain legal material. It is this reporter's opinion that he can obtain legal material upon request. Due to his status in the RHU it is improbable to provide physical access to the Law Library. [Stepanik Decl. at Ex. "V."] [7]

Finally, the July 9, 1992 PRC review report, in pertinent part, stated:

> [Young] presented the PRC with a list of ... requests.... 1) He requested to be placed in general population. Young is considered a serious escape risk and this request is denied. 2) He requested to be allowed to meet with his attorney without handcuffs. This is a security precaution that is required in this status and this request is denied. PRC fails to see how reviewing paperwork cannot be accomplished with handcuffs. 3) He asked for the opportunity to make phone calls. PRC indicates that the majority of his phone calls are being made preclude having an inmate pay for the call. They must be collect calls. 4) He indicates that books are in the Mailroom for him. PRC directs that certain books will be reviewed by his counselor and the required number will be permitted pursuant to RHU regulations. 5) He asked for an inmate manual. This will be provided. 6) He asked to go to the Law Library. There is a RHU procedure

---

**5.** The PRC consisted of defendant Gabriel as well as Edgar M. Kreiss and Joseph J. Piazza, who are not defendants to this action. Defendant Stepanik signed the report on April 30, 1992.

**6.** The PRC consisted of defendants Gabriel and Larkins, as well as Edgar M. Kreiss. Defendant Stepanik signed the report on June 6, 1992.

**7.** The PRC consisted of defendants Gabriel, Crisler, and Pikulski. Defendant Stepanik signed the report on June 26, 1992.

whereby he can request information from the Law Library. [Stepanik Decl. at Ex. "V."] [8]

Young complains of a number of aspects of his confinement at SCI–Dallas. For example, he complains that the defendants refused to release him into the general prison population. (Compl. at ¶¶ 4 and 5.) [9] He alleges that the defendants required him to "meet with counsel in handcuff's [sic]," which purportedly hampered his ability to review documents and make "notes in the presence of his legal counsel." (Compl. at ¶ 31.) Moreover, Young alleges that he "was allowed fewer visits with family than prisoners in general population," and that he "had to visit family with handcuffs on and that condition is not placed on prisoners who are convicted but in general population." (Compl. at ¶¶ 31 and 34.) Young alleges that his legal mail "was opened and inspected and censored before given to" him. (Compl. at ¶¶ 19 and 20.) He alleges that he was refused "free copies of legal documents that the plaintiff requested to be copied and needed to have copied, for court filing in his criminal case." (Compl. at ¶ 12.)

Other claims of Young include:

—that the defendants refused to allow his attorney "into the prison to see the plaintiff" (Compl. at ¶ 32)

—that he was denied physical access to the prison library and that he was not offered a "para legal" assistant (Compl. at ¶¶ 10 and 11) [10]

—that he had "no *private* access to a telephone for legal phone calls as all calls were made from the ... gate door to the plaintiff's cell [so that] other inmates and guards [had] the opportunity to listen to the plaintiff's conversations" (Compl. at ¶ 14) [11]

—that he was denied "from receiving a beard trim," though he acknowledges that he was allowed to shave the beard, and that he "was denied the ability to have hair cuts in the barbershop ... but had to receive a hair cut" in his cell (Compl. at ¶ 16)

Young alleges that the conditions of his confinement in RHU were "more severe" and "more punitive [sic] than that of prisoners in general population." (Compl. at ¶¶ 33 and 41.) Young asserts that his Fourteenth Amendment rights were violated because, as Young alleges, he was confined "under conditions that imposed upon the plaintiff ... materially greater restrictions of his freedom than those upon convicted prisoners in the same institution." (Dkt. Entry # 42.)

On April 20, 1993, the defendants filed the instant motion to dismiss. (Dkt. Entry # 7.) The Court later directed that "the motion shall be treated as one for summary judgment and adjudicated in the manner provided by Rule 56." (Dkt. Entry # 26 at 2.) [12] The Court also ordered the defendants to file a statement of material facts and the plaintiff to respond to the statement, a directive with which the parties have complied. [13]

---

8. The PRC consisted of defendants Gabriel and Crisler as well as Edgar M. Kreiss. Defendant Stepanik signed the report on August 3, 1992.

9. Young also alleges the defendants were aware that a "correctional counsellor [sic]," James Kominski, recommended that Young be removed from RHU and that the counselor "attempted to call the Lackawanna County Court Judges and the Federal Judges to inform them Dallas is a maximum security prison and has no facility to hold pre trial detainees." (Compl. at ¶¶ 25 and 26.)

10. Young asserts that the "Defendants targeted the Plaintiff as a JAIL HOUSE lawyer and had planned in advance of the Plaintiff's arrival action to isolate him and to deny him access to the law library-phone-and private legal visits." (Dkt. Entry # 49 at 3.)

11. In a later filing, Young alleges that he "had no phone calls during that period of incarceration," (Dkt. Entry # 49 at 3), which is directly refuted by his complaint, where Young complains that his "phone calls were limited to one call every 30 days, and for only 15 minutes." (Compl. at ¶ 15.)

12. The Court did so because the defendants filed supporting affidavits and other accompanying materials with their motion to dismiss. When the Court examines documents outside of the pleadings, it construes the motion as one for summary judgment. F.R.C.P. 12(b).

13. Two final points of factual background need to be noted. First, between April and June of 1992, Young was transported on at least five occasions by the Pennsylvania State Police to proceedings before the Lackawanna County

## DISCUSSION

### Defendants' Summary Judgment Motion

■ Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment will not lie "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). There is no issue for trial unless sufficient evidence exists which favors the non-moving party so that a jury may return a verdict for that party. *Anderson*, 477 U.S. at 249–250, 106 S.Ct. at 2510–2511.

■ A fact is "material" if proof of its existence or non-existence would affect the outcome of the lawsuit under the law applicable to the case. *Id.*, at 248, 106 S.Ct. at 2510. Summary judgment thus should be entered when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■ The burden of demonstrating the absence of genuine issues of material fact initially rests with the moving party regardless of which party would have the burden of persuasion at trial. *Celotex*, 477 U.S. at 321–25, 106 S.Ct. at 2552–54. After the moving party meets this burden, the non-moving party must present sufficient evidence to establish the existence of every element essential to that party's case. *Id.* The responding party may not rest on the allegations of his pleading but must present specific facts by affidavit or otherwise which are sufficient to create a genuine issue of material fact.

*Sunshine Books Ltd. v. Temple University*, 697 F.2d 90 (3rd Cir.1982).

■ It is well-established that a state or state governmental entity is not encompassed by the term "person" as used in 42 U.S.C. § 1983. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 65–66, 109 S.Ct. 2304, 2309–10, 105 L.Ed.2d 45 (1989). Consequently, summary judgment will be granted with respect to the Pennsylvania Department of Corrections. It also is well-established that state officials may be sued for Section 1983 violations only in their "individual capacity," and not in their "official capacity." *Hafer v. Melo*, 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). Consequently, summary judgment will be granted for the defendants to the extent that Young sues them for actions taken in their official capacity.

In moving for summary judgment, the defendants group a portion of Young's claims under the topical headings "Conditions Claims" and the remaining contentions under the category "Access To Courts Claims." The "Conditions" and "Access" claims presented in this case will be addressed *seriatim*.

### "Conditions Claims"

Because Young was confined at SCI–Dallas as a pre-trial detainee, and not as a convicted prisoner, the proper analysis of Young's complaints regarding his conditions of confinement begins with the Supreme Court's decision in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), in which the Court stated:

> In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee.... A court must decide whether the disability is

---

Court of Common Pleas. The "Temporary Transfer Information" forms prepared by SCI–Dallas officials for the benefit of the state police in transporting Young noted that Young should be kept under "close custody due to escape history." (Stepanik Decl. at Ex. "IV.") Second, on

September 3, 1992, Young was charged with unauthorized use of the mail, in violation of prison policy, for sending out mail in the name of another prisoner. (*See* materials attached to Stepanik Decl. at Ex. "IX.")

imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of the detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." *Id.* at 535, 538, 99 S.Ct. at 1872, 1873–74 (1979) (footnotes and citations omitted).

The Court concluded:

> [I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not without more, amount to "punishment." *Id.* at 539, 99 S.Ct. at 1874.

The Court admonished that when deciding whether a specific restriction is "reasonably related" to the security interest of the institution, it must be recognized that:

> [security] considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations courts should ordinarily defer to their expert judgment in such matters. . . . [P]rison administrators [are to be] accorded *wide-ranging deference* in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. *Id.* at 540 n. 23, 547, 99 S.Ct. at 1875 n. 23, 1878 (emphasis added).

In *Block v. Rutherford,* 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984), the Supreme Court held that a blanket prohibition against pretrial detainees receiving contact visits from the general public or their family was "an entirely reasonable, nonpunitive response to the legitimate security concerns identified [by the prison administrators], consistent with the Fourteenth Amendment." *Id.* at 588, 104 S.Ct. at 3233. The *Block* court also observed:

> Detainees . . . often are awaiting trial for serious, violent offenses, and many have prior criminal convictions. Exposure of this type person to others, whether family, friends, or jail administrators, necessarily carries with it risks that the safety of innocent individuals will be jeopardized in various ways. They may, for example, be taken as hostages or become innocent pawns in escape attempts. It is no answer, of course, that we deal here with restrictions on pretrial detainees rather than convicted criminals. For . . . in this context, "[t]here is no basis for concluding that pretrial detainees pose any lesser security risk than convicted inmates." Indeed, . . . "it may be that in certain circumstances [detainees] present a greater risk to jail security and order." 468 U.S. at 586–87, 104 S.Ct. at 3233 (citations omitted).[14]

In *Martucci v. Johnson,* 944 F.2d 291, 293 (6th Cir.1991), the court examined the § 1983 complaint of a pretrial detainee who was housed in segregated confinement for eight days because an agent of the state's bureau of investigation reported that the detainee was planning an escape. The detainee was confined during this period to a "six by ten foot cell furnished only with a bed, sink, and toilet." *Id.* at 293. The detainee's "mail was withheld and he had no access to a telephone." *Id.* "At no time during his confinement was [the detainee] informed of the reasons for his segregation." *Id.* The court determined:

> Because the conditions imposed on [the detainee] during the eight days of his segregated confinement were "reasonably related to [the] legitimate governmental objective" of aborting his escape and insuring

---

14. The *Block* court further cautioned:
   When the District Court found that many factors counseled against contact visits, its inquiry should have ended. The court's further "balancing" resulted in an impermissible substitution of its view on the proper administration [of the jail] for that of the experienced administrators of that facility. Here, . . . "[i]t is plain [that] the lower courts simply disagreed with the judgment of [the jail] officials about the extent of the security interests affected and the means required to further those interests." 468 U.S. at 589, 104 S.Ct. at 3234.

his presence at trial, segregation did not, under the circumstances, amount to unconstitutional "punishment." Because it did not amount to punishment, the [detainee's] placement in segregated confinement did not, in and of itself, violate principles of due process as applied in the context of pre-trial detention." *Id.* at 294 (citations omitted).

The court also construed the detainee's complaint to allege violations of his due process rights because he was not afforded a hearing before being placed in segregated housing. *Id.* Addressing the detainee's argument that the state's prison regulations required a hearing in "cases of alleged violations of prisoner conduct rules," the court asserted:

> [The detainee] was *not* subjected to "discipline" for violation of a prison rule. Rather, he was reasonably placed in segregated confinement for what amounted to purely administrative reasons—reasons anchored in a desire to foil his escape, thereby preserving institutional security and insuring [the detainee's] presence at trial. *Id.* at 294–95.

Young complains that the defendants refused to release him into the general prison population. (Compl. at ¶¶ 4 and 5.) He alleges that the "defendants continually lied and asserted that the plaintiff escaped from prison previously knowing and being informed the plaintiff never attempted escape from prison and has never been charged as a fugitive at any time in his entire life." (Compl. at ¶ 21.) He alleges that the defendants "asserted that the plaintiff was a violent man and knew that to be false as the plaintiff has no violent convictions on his record and has never been convicted of such offenses." (Compl. at ¶ 22.) [15]

In contrast to Young's bald assertions, defendants have presented evidence supporting the decision to place Young in restricted housing. Indeed, the SCI–Dallas officials received Young at the order of the Lackawanna County Court of Common Pleas because Young presented the "potential for witness intimidation and tampering." (Stepanik Decl. at Ex. "II.") In light of such an order, and given the need to evaluate a new inmate before introducing him into the general prison population, the decision by the SCI–Dallas officials to place Young in restricted housing was "an entirely reasonable, nonpunitive response to legitimate security concerns . . . consistent with the Fourteenth Amendment." *Block,* 468 U.S. at 588, 104 S.Ct. at 3233.[16] There is no "evidence in the record to indicate that the officials have exaggerated their response" in their treatment of Young. *Bell,* 441 U.S. at 540 n. 23, 99 S.Ct. at 1875 n. 23.

Furthermore, the defendants' decision to continue holding Young in restricted housing was an "incident of some other legitimate governmental purpose," *id.* at 538, 99 S.Ct. at 1873, namely the institutional securi-

---

**15.** Young's instant complaints arise from far different circumstances than his complaints in *Young v. Keohane,* 809 F.Supp. 1185 (M.D.Pa. 1992) (Conaboy, J.). There, Young complained about his incarceration as a pretrial detainee at the United States Penitentiary in Lewisburg, Pennsylvania ("USP–Lewisburg"). Specifically, Young alleged that he was housed in "a converted gymnasium 31 feet long and 11 feet wide" with up to ten other pretrial detainees. *Id.* at 1188. Young's unrefuted allegations included that, as the court explained, the detainees were "regularly required . . . to urinate in cups inside" the gymnasium. In contrast to the conditions of his incarceration at USP–Lewisburg, for which a rationale related to security concerns was not articulated, the SCI–Dallas officials expressed legitimate reasons for incarcerating Young in the RHU.

**16.** The defendants explain that prisoners labeled as an "HVA," as was Young:

> typically are of great concern from an operational standpoint because so little is known about them. Unlike committed, sentenced prisoners who have been evaluated and tested over a period of several weeks or months, during which time their personal, behavioral and criminal histories are assessed with a view toward classifying them for assignment to a suitable facility, HVAs have not been subjected to similar evaluations. As a result, it is often hard to reliably predict how they will interact in the general population of an institution such as SCI–Dallas . . .
>
> It is generally unknown if they pose a threat to any particular individual(s) who may happen to be in the population and vice versa, or if there is some other consideration that may cause them to be the target of an attack. . . . [Stepanik Decl. at ¶ 37.]

ty of the SCI–Dallas facility. As explained by the SCI–Dallas superintendent, defendant Stepanik:

> Young's own conduct raised serious concerns about the suitability of his release to the general population. Shortly after his arrival, he engaged in a hunger strike, which caused his transfer from RHU to a psychiatric observation room. This occurrence, which Young initially denied engaging in then later admitted, suggested the possibilities that he might be seeking to harm himself or that he was seeking to disrupt institutional operations. [Stepanik Decl. at ¶ 37.]

Finally, similar to the warnings relayed to the jailers in *Martucci* by a state bureau of investigation officer, SCI–Dallas officials received stern warnings from a Pennsylvania state trooper about the security threat Young posed.

The Supreme Court has instructed that this Court must accord to prison administrators "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 547, 99 S.Ct. at 1878. The decision to hold Young in restricted housing "is reasonably related to a legitimate governmental objective." *Id.* at 539, 99 S.Ct. at 1874. In the absence of a showing by Young "of an expressed intent to punish on the part of the detention facility officials," *id.* at 538, 99 S.Ct. at 1873–74, Young's complaints that he was housed in segregated confinement as a pretrial detainee fail to present triable issues. Defendants merit summary judgment on these complaints.

█ Young also alleges that he "was allowed fewer visits with family than prisoners in general population" and that he "had to visit family with handcuffs on and that condition is not placed on prisoners who are convicted but in general population." (Compl. at ¶¶ 31 and 34.) It is clear that the defendants are entitled to summary judgment regarding this claim, as well. The Supreme Court in

*Block*, as discussed above, held that the constitution does not require that pretrial detainees be allowed contact visits when prison administrators have determined that such visits will jeopardize the security of the facility. 468 U.S. at 588–89, 104 S.Ct. at 3233–34. It would seem, at the very least, that in being allowed contact visits with his family, Young was afforded more privilege than constitutionally required. Additionally, it has been held that the mere fact that a prisoner is confined in a segregation unit substantiates the use of a security belt and handcuffs while receiving visitor's, although such a holding was premised on a finding that such measures did not violate the prisoner's Eighth Amendment rights. *Hanna v. Lane*, 610 F.Supp. 32, 35–36 (N.D.Ill.1985) ("For Eighth Amendment purposes, the mere fact of segregation is sufficient to justify use of handcuffs and a security belt for purposes of receiving contact visits."). Consequently, the defendants are entitled to judgment as a matter of law with respect to this claim.

█ Young also alleges that he was denied "a beard trim," although he acknowledges that he was allowed to shave the beard, and that he "was denied the ability to have hair cuts in the barbershop ... but had to receive a hair cut" in his cell. (Compl. at ¶ 16.) The defendants assert that prisoners "in administrative custody may request and receive haircuts by the same inmate barbers who give haircuts to general population inmates." (Stepanik Decl. at ¶ 44.) It is apparent that Young was afforded the opportunity to receive satisfactory grooming to maintain personal hygiene and satisfy minimal constitutional standards. Accordingly, defendants are entitled to a judgment as a matter of law on this claim.

### *"Access To Courts Claims"*

█ Young asserts in his complaint that he was denied physical access to the prison library and that he was not offered a "para legal" assistant. (Compl. at ¶¶ 10 and 11.) [17] In response, the defendants maintain:

---

17. Young also asserted in a later filing that he "never received his law books or any of his legal materials." (Dkt. Entry # 49 at 4.) Because this

assertion, which Young failed to include in his complaint, does not adequately allege the personal involvement of a defendant in this action, the

Administrative custody inmates may request and receive legal materials from the prison's law library. If they wish, and have the funds to do so, they may also purchase materials from the appropriate vendors. (Stepanik declaration at ¶ 47.)[18] In *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), the Supreme Court held "that the fundamental constitutional right of access to the courts requires prison officials to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Id.* at 828, 97 S.Ct. at 1498.[19]

The Court of Appeals for the Sixth Circuit in *Martucci v. Johnson*, 944 F.2d at 291, discussed above, also addressed the detainee's claim that his constitutional right of access to the courts had been violated during the entire period he was held as a pretrial detainee because the jail facility in which he was held contained no law library. The court found significant the fact that, as at SCI–Dallas, "the record disclosed that jail officials were in the practice of providing legal materials to inmates 'upon request.'" *Id.* at 295. The court also found persuasive that, like Young, the detainee was represented by appointed counsel during his entire detention. *Id.* In response to the detainee's argument that the "counsel was appointed to defend him in the criminal case and not to represent him as a plaintiff in a civil rights action," the court responded:

> There is, however, nothing in the record to lend support to the presumption that [the detainee] was barred from discussing his segregated confinement—and the legal implications thereof—with his appointed attorney. The availability of counsel during [the detainee's] period of pre-trial confinement, coupled with the jailers' unrebutted assertion that they provided inmates with legal materials upon request, defeats [the detainee's] access to courts claim. *Id.*

The analysis and rationale employed by the Court of Appeals for the Sixth Circuit in *Martucci* is particularly apt here. Like the record before the *Martucci* court, there is nothing in the instant "record to lend support to the presumption that [Young] was barred from discussing his segregated confinement—and the legal implications thereof— with his appointed attorney." *Martucci*, 944 F.2d at 295. Moreover, in response to the Defendants' statement of uncontested fact that the SCI–Dallas policy in effect during Young's stay allowed him to request legal items from the law library which would be provided to him, (Dkt. Entry # 38 at ¶ 42), Young replied as follows: "UNKNOWN AS TO POLICY DENIED AS TO LEGAL HELP." (Dkt. Entry # 49 at ¶ 42.) Young did not refute that he had the opportunity to request and receive legal materials; Young

Court declines to interpret it as expanding upon the allegations set forth in his complaint.

On a similar note, defendants argue that Young's complaint fails to establish personal involvement by the respective defendants. (Dkt. Entry # 18 at 9.) As the filings submitted by the defendants reveal, however, defendants Stepanik, Larkins, Crisler, Pikulski, and Gabriel, *inter alia*, participated in the various reviews of Young's RHU confinement conducted by the Program Review Committee. With regard to defendant Lehman, however, it is true that Young's complaint fails to establish Lehman's personal involvement, which serves as an additional basis for granting summary judgment with respect to claims against him.

**18.** Were the defendants' motion for summary judgment not being granted with respect to Young's complaints that he did not have personal access to a law library, it nevertheless might be appropriate to stay Young's action pending the disposition of a case before the United States

District Court for the Eastern District of Pennsylvania, *Austin v. Pennsylvania Department of Corrections, et al.*, Civil Action No. 90–7497. In *Austin*, the district court certified, pursuant to Federal Rule of Civil Procedure 23(b)(2), "a class consisting of all persons who are now or who will in the future be confined by the Pennsylvania Department of Corrections in a facility other than State Corrections Institution at Muncy or State Corrections Institution at Pittsburgh...." (March 5, 1992 Order in *Austin*.) The Second Amended Complaint in *Austin* alleges that inmates in restrictive custody, such as administrative segregation, are denied physical access to the law library and that "[a]lternative provisions for such inmates are totally inadequate." (*Id.*)

**19.** Young's claim that he was refused "free copies of legal documents," (Compl. at ¶ 12), may be summarily dismissed since Young enjoys no constitutional right to free and unlimited photocopying. *Johnson v. Moore*, 948 F.2d 517, 521 (9th Cir.1991).

only reiterated that he was not offered "legal help." [20] Here, as in *Martucci*, "the jailers' unrebutted assertion that they provided inmates with legal materials upon request, defeats [Young's] access to courts claim." [21] *Martucci*, 944 F.2d at 295.

■ An additional access to courts claim advanced by Young is his assertion that he was forced to "meet with counsel in handcuff's [sic]," purportedly impairing Young's ability to review documents and make notes. (Compl. at ¶ 31.) An inmate's right of access to the courts encompasses the right to contact visits with his or her attorney. *Ching v. Lewis*, 895 F.2d 608, 609 (9th Cir.1990); *Adams v. Carlson*, 488 F.2d 619 (7th Cir. 1973); *Mann v. Reynolds*, 828 F.Supp. 894 (W.D.Okla.1993). Because contact visits enable the attorney "to assess a witness' demeanor and credibility," they are a necessary means for the establishment of a relationship between the inmate and his or her lawyer. *Casey v. Lewis*, 773 F.Supp. 1365, 1367 (D.Ariz.1991).

In a case decided only last year, the District Court for the Western District of Oklahoma examined the practice in one prison where inmates meet their attorneys in a room divided:

> by a locking door and a metal grate with diamond-shaped interstices of approximately ¾ inch which divides the room above a three-foot-wide counter. A pass-through space is approximately four inches tall and 16 inches wide. The pass-through space is sufficient to allow the inmate and attorney to shake hands and, of course, pass through any necessary documents. *Mann*, 828 F.Supp. at 898–99. [22]

The district court noted:

> [P]laintiffs are constitutionally entitled to contact visits with their attorneys. The level or nature of the contact is a different question. This Court is unaware of any other reported decision discussing the level of contact *minimally* required to protect plaintiffs' constitutional rights. The question thus becomes whether the present system, providing some contact, satisfies the requirement of providing adequate, effective, and meaningful access to the courts. *Id.* at 904. [23]

---

**20.** Furthermore, Young is a very litigious individual and has filed numerous law suits in federal court; Young does not allege in any filing in this case that his legal efforts were actually hampered with regard to any of his pending lawsuits or with regard to lawsuits he intended to initiate.

**21.** In *Abdul–Akbar v. Watson*, 4 F.3d 195, 198 (3rd Cir.1993), our Court of Appeals addressed a prison "paging system" for access to library materials, which is a system where "photocopies of materials available at the [prison's] main law library—such as cases, motions, briefs, etc.— could be obtained free of charge." In *dicta*, the court observed, without deciding, "that a paging system, alone, [may] not satisfy the legal access rights of segregated prisoners who were prohibited from visiting the law library...." *Id.* at 202. Furthermore, the court explained that "the standard to be applied is whether the legal resources available to a prisoner will enable him to identify the legal issues he desires to present to the relevant authorities, including the courts, and to make his communications with and presentations to those authorities understood." *Id.* at 203. Young has wholly failed to demonstrate that he did not have access to resources of some form or another to enable him to perform as the Third Circuit described. Young's failure to develop the record to demonstrate that he was denied this access—rather than just aver that he was not offered the access—requires summary judgment for the defendants. Moreover, given the Sixth Circuit's compelling discussion in *Martucci* and the fact that the Third Circuit has not provided clear authority that the provisions made by SCI–Dallas authorities failed to satisfy constitutional requirements, this case compels summary judgment.

Finally, although the Third Circuit has held that when a claim "directly [involves] prisoners' access to legal knowledge, an actual injury necessarily occurs by virtue of a prison's failure to provide the level of assistance required under *Bounds*," *Peterkin v. Jeffes*, 855 F.2d 1021, 1041 (3rd Cir.1988), Young has not shown that defendants failed to provide the *Bounds*–level of assistance.

**22.** The *Mann* court noted that prior to the use of the attorney-visitation room, as described here, the prison allowed for attorney visitation:

> in a small room providing full contact between attorney and client.... The room was furnished with a table and chairs and prisoners were fully restrained with leg shackles, handcuffs, and a belly chain, while in the room with an attorney. 828 F.Supp. at 897.

The court, however, did not pass on the constitutionality of such an environment.

**23.** In addressing complaints about attorney visits involving "the most violent and dangerous prisoners in the country," the Seventh Circuit ob-

Applying "the four factor analysis established by *Turner v. Safley*," 482 U.S. 78, 89–90, 107 S.Ct. 2254, 2262, 96 L.Ed.2d 64, the district court upheld the constitutionality of the prison's actions. The *Turner* factors for "determining the reasonableness of the [prison] regulation" are: 1) "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it;" 2) "alternative means of exercising the right that remain open to prison inmates;" 3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally;" and 4) "the absence of ready alternatives." *Turner*, 482 U.S. at 89–90, 107 S.Ct. at 2262.

■ In Young's case, defendants' requirement that Young visit with counsel while handcuffed did not violate Young's right of access to courts.[24] Despite wearing handcuffs, Young was allowed direct contact with his attorney. Young could write and shake hands with his attorney. Young was only limited in the extent of movement he could enjoy with his hands.[25]

■ An additional access to courts claim advanced by Young is the claim that he had "no *private* access to a telephone for legal phone calls as all calls were made from the ... gate door to the plaintiff's cell [so that] other inmates and guards [had] the opportunity to listen to the plaintiff's conversations." (Compl. at ¶ 14.) The district court in *Mann*, 828 F.Supp. at 906, also considered the prison policy of providing double-celled prisoners with a portable phone brought to the edge of the cell. The phone, however, was equipped with a long cord to allow the prisoner to "take the receiver to the back of the cell and achieve privacy from his cellmate." *Id.* The court concluded that the prisoners' access passed "constitutional muster." *Id.*

Unlike the situation examined in *Mann*, Young was "single-celled," and the provision of a long cord to "achieve privacy from his cellmate" would not be required. The fact that Young was not provided an enclosed room in which to make such calls, but that the phone was brought to his cell, did not violate Young's constitutional rights. Although Young should be afforded privacy from prison officials monitoring conversations with his attorneys, the mere allegation that prison guards had "the opportunity to listen to the plaintiff's conversations," as

served that the "handcuffing, the shackling [and] the boxing of the handcuffs ... are reasonable measures in view of the history of violence at the prison and the incorrigible, undeterrable character of the inmates." *Bruscino v. Carlson*, 854 F.2d 162, 166 (7th Cir.1988), *cert. denied*, 491 U.S. 907, 109 S.Ct. 3193, 105 L.Ed.2d 701 (1989). The "boxing of the handcuffs" refers to a "black box," "a hard plastic box place over the lock apparatus that runs between the prisoner's handcuffs." *Knox v. McGinnis*, 998 F.2d 1405, 1407 (7th Cir.1993).

The *Bruscino* litigation arose out of the complaints of prisoners at the United States Penitentiary at Marion, Illinois ("USP–Marion"), concerning their conditions of confinement during a "lockdown" period, which had existed for over half a year at the time the prisoners filed their complaint. The district court explained:

> Control Unit inmates are restrained with handcuffs, a black box and leg restraints during visits. Plaintiffs contend that these restraints, particularly the black box, not only cause great discomfort, but also make it very difficult to write and to pass papers back and forth, and generally, to meaningfully communicate with their attorney. *Bruscino v. Carlson*, 654 F.Supp. 609, 617 (S.D.Ill.1987), *aff'd*, 854 F.2d

162 (7th Cir.1988), *cert. denied*, 491 U.S. 907, 109 S.Ct. 3193, 105 L.Ed.2d 701 (1989).

The Seventh Circuit cautioned:

> Crucial to our decision in *Bruscino* was the fact that the Marion facility "is the successor to Alcatraz as the prison designed to hold the most violent and dangerous prisoners in the federal system." ... Marion [is] "the most severe prison in the country," housing "not only the worst federal prisoners but, on a contract basis, state prisoners too violent for state prisons to handle." *Knox*, 998 F.2d at 1411 n. 13 (*quoting Bruscino*, 854 F.2d at 163–64).

24. Indeed, such a response by the SCI–Dallas officials was quite reasonable in light of the fact that, as noted above, a Pennsylvania state trooper · warned SCI–Dallas officials that a previous attorney for Young was arrested for blocking a doorway while Young made his getaway.

25. Although the district court in *Mann* applied the four-factor analysis developed in *Turner*, it is unclear whether that analysis is applicable in the context of the incarceration of pretrial detainees, since the *Turner* court developed it in a case involving convicted prisoners. Nevertheless, application of the four-factor analysis in Young's case would result in the same outcome.

Young alleges, is insufficient. Because Young has failed "to make a showing sufficient to establish the existence of an element essential to" his case, *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552, the defendants are entitled to judgment as a matter of law with regard to this issue.

■ Finally, with respect to Young's allegations that his legal mail "was opened and inspected and censored before given to the plaintiff," (Compl. at ¶¶ 19 and 20), the defendants simply cite to Pennsylvania Bureau of Correction regulations which provide that correspondence to or from attorneys, and clearly identified as such, may "be opened, read, censored or reproduced" only in limited circumstances, of which each circumstance requires the approval of the superintendent. (Stepanik Decl. at 10.) Again, Young has made bald allegations with respect to his mail and has provided no evidence of any sort to substantiate his claim. Because Young has not produced sufficient evidence "so that a jury may return a verdict" in his favor, *Anderson,* 477 U.S. at 249–250, 106 S.Ct. at 2510–11, summary judgment will be granted to the defendants on this aspect of Young's claim.

An appropriate Order will be issued.

### ORDER

**NOW, THIS** 30th **DAY OF SEPTEMBER, 1994,** for the reasons set forth in the accompanying Memorandum, **IT IS HEREBY ORDERED THAT:**

1. Plaintiff Richard Young's "Motion To Compel Defendants To Comply To Plaintiff's [First] Request For Production Of Documents" (Dkt. Entry # 46) is **DENIED** as moot.

2. The defendants' motion to dismiss (Dkt. Entry # 7), which the Court treats as a motion for summary judgment, is **GRANTED.**

3. The Clerk of Court is directed to close this case file.