Anthony MANN; Alvin J. Hale; John Duvall; Scotty L. Moore, Plaintiffs–Appellants,

v.

Dan M. REYNOLDS; Rita Andrews; Fred Cook; Gary D. Maynard; David Walters, Governor; Robert Sanders, Individually and in his Official Capacity as Coordinator, Substance Abuse/Mental Health Services, Defendants–Appellees.

Nos. 93–6322, 94–6013.

United States Court of Appeals, Tenth Circuit.

Feb. 1, 1995.

Micheal Salem (D. Gregory Bledsoe, Tulsa, OK, with him on briefs), Norman, OK, for plaintiffs-appellants.

Guy L. Hurst, Asst. Atty. Gen. (Susan B. Loving, Atty. Gen. of Okl., with him on brief), Oklahoma City, OK, for defendants-appellees.

Before MOORE, McKAY, and LOGAN, Circuit Judges.

JOHN P. MOORE, Circuit Judge.

This is a class action civil rights suit filed under 42 U.S.C. § 1983 on behalf of plaintiffs Anthony Mann, Alvin James Hale, John Duvall, and Scotty Lee Moore, representatives of a class of all present and future death row and high-maximum security inmates (Inmates) incarcerated in H–Unit at the Oklahoma State Penitentiary, McAlester, Oklahoma (OSP). Counsel challenged an OSP policy prohibiting barrier-free or contact visits between Inmates and examining psychologists, other health professionals, and legal counsel, alleging the policy violated Inmates' Sixth and Fourteenth Amendment rights.

The district court held the OSP policy violated Inmates' Sixth and Fourteenth Amendment rights but determined alterations of that policy unilaterally adopted by OSP during the course of the litigation by Dan Reynolds, the OSP warden, and other OSP personnel (the State) were "in compliance with constitutional requirements" and denied further relief. *Mann v. Reynolds,* 828 F.Supp. 894, 908 (W.D.Okl.1993). The court also dissolved stays of execution previously ordered. In a subsequent order, the court granted attorney fees under 42 U.S.C. § 1988 but reduced the amount.

Both decisions are the subject of this appeal. First, Inmates contend the court's order concluding they "do not have a right of access to the courts and access to counsel which includes a meaningful right to 'barrier free' visitation and adequate telephone visitation" is error. Second, counsel contend the court's failure to award the full amount of fees they requested was an abuse of discretion. We conclude the district court properly analyzed the constitutional issues, but we reverse the conclusion the modified policy is constitutionally permissible. Given this result, we remand for further consideration of the attorney fee award.

After suit was filed and during pretrial proceedings, the State altered its policy to permit medical experts and psychologists to interact with Inmates while performing clinical or psychological testing. However, Inmates' attorneys, either private counsel or attorneys with the Oklahoma Indigent Defense System (OIDS), were required to continue meeting with their clients in a visitation booth separated by a wire mesh plexiglas partition while communicating by telephone and passing documents through a two-inch hole prison staff later drilled. The State had not accommodated double-celled Inmates' request for confidential telephone calls to their attorneys even though approximately 89% of Inmates are double-celled. By the start of trial, the State proposed a different barrier arrangement for counsel to meet with Inmates and promised to work on securing confidential telephone communications for double-celled Inmates.

Consequently, although the district court granted Inmates declaratory and injunctive relief, concluding "non-contact visitation between attorneys and death row inmates is violative of the Sixth and Fourteenth Amendments to the United States Constitution," *id.* at 907, it stopped short of declaring "full contact visitation without limitation between death row inmates and their attorneys is [ ] mandated by the Sixth or Fourteenth Amendments." *Id.* In this appeal, counsel urge we adopt unlimited contact between Inmates and their counsel as a constitutional requisite.

## I.

We begin our review from the district court's point of legal demarcation. The court stated:

> [T]his Court concludes that plaintiffs are constitutionally entitled to contact visits with their attorneys. The level or nature of the contact is a different question.... The question thus becomes whether the present system, providing some contact, satisfies the requirement of providing adequate, effective, and meaningful access to the courts. If the present system infringes on the constitutionally required level of contact, it cannot be continued unless the defendants can offer a valid and rational connection between their visitation policy and legitimate security concerns, and that such policy complies with the four factor analysis established by *Turner v. Safley*, 482 U.S. [78] at 89–90, 107 S.Ct. [2254] at 2261–62 [96 L.Ed.2d 64 (1987) ].

*Mann,* 828 F.Supp. at 904. Neither party having questioned the court's characterization of its task, we are now called upon to review whether its ensuing determinations comport with *Turner.*

The district court found the new policy adopted in response to this suit provides an attorney-client visitation room which may be observed through a glass and barred window. Into this room, prison personnel escort an Inmate, wearing full restraints, to his designated half of the cubicle. The restraints are then removed except for leg-irons. The guard locks the Inmate into that space and escorts the lawyer to the other side of the cubicle. "The room is divided by a locking door and a metal grate with diamond-shaped interstices of approximately ¾ inch which divides the room above a three-foot-wide counter." *Id.,* 828 F.Supp. at 898–99. The court, citing testimony, stated this setting caused "headaches, dizziness, lack of focus, and general malaise," *id.* at 899, and noted prison officials "agreed that a clear Plexiglas or equivalent window at eye height should be placed in the grate to allow unimpeded vision." *Id.*

The court also found despite the no-contact policy, "there are a multitude of instances

where inmates come in contact with others." *Id.* These included contact with other Inmates and law clerks who are also Inmates in the H–Unit law library; contact during religious services and at the barber shop staffed by Inmates; contact with medical, psychological, and other prison staff as well as visiting chaplains; contact with the public during tours of the facility; and contact with civilian female librarians and visiting law enforcement personnel.

Furthermore, the court determined virtually all Inmates have different counsel at each stage of their representation and thus would be expected to begin a new relationship with a third post-conviction attorney in this setting. At this stage of the attorney-client relationship, the district court observed, death row attorneys have "a particular need to establish trust and communication, and to explore all avenues of possible trial error or mitigation," in the process of habeas review. *Id.* at 901. To do so, counsel often has to probe "painful and emotional past acts or occurrences and certainly circumstances surrounding the inmate and his crime which are not easily divulged to strangers." *Id.* In the case of Inmates with special needs—those who are retarded, blind, deaf, or request a waiver of appeal—the district court found different accommodations might be necessary when meeting with their attorneys. The court noted, for example, "with the inmates with special problems, the attorney is often called upon to interpret documents or read them to the client, and full contact assists in this tandem review of documents, exhibits, transcripts, etc." *Id.* at 901.

The district court further noted the "significant evidence" that "[d]eath row inmates present no greater security risk than any other high-maximum security inmate ... [and] less of a management problem than many offenders convicted of less serious crimes." *Id.* at 901. In contrast, the court stated other convicted murderers under a life sentence are in full contact settings. The court acknowledged plaintiffs' exhibit reflecting that nine states allow full contact visits between death row inmates and their attorneys. Although noting the State's witnesses from Utah and Texas who testified OSP's policy was more liberal than those in their institutions, it found female inmates sentenced to death and housed at the Mabel Bassett Correctional Center in Oklahoma City are permitted full contact visits with their attorneys. Moreover, all Oklahoma county jails permit "full-contact visits between counsel and any defendant accused in a capital murder case." *Id.* at 902. Indeed, it stated, "Institutional behavior is generally better for death row inmates because such behavior may be used as evidence in mitigation or commutation proceedings." *Id.* at 901.

Finally, the district court cited unexplained incidents in which prison officials failed to permit Inmates scheduled to testify at this trial to be transported to Oklahoma City and refused to allow plaintiffs' experts to tour H–Unit and have access to information upon which to base their opinions despite the court's orders. These were, the court denominated, "important facts" when combined with:

> (1) the total absence of any institutional planning to accommodate confidential attorney visitation in H–Unit, (2) the apparent hostility by prison employee to OIDS attorneys throughout the testimony, and (3) the inconsistent application of the non-contact policy. *Together, these facts compel a finding that OSP maintains an institutionally sanctioned attitude of hostility and opposition to attorneys who attempt to represent death row inmates.... The blanket adversarial position taken against OIDS attorneys representing death row inmates is apparent on this record and is unjustified.*

*Id.* at 902 (emphasis added).

The factual picture thus painted by the district court suggests the State circumscribed its concept of restricted contact solely to visits between Inmates and their attorneys. At the center of the painting, drawing stark contrast to the remainder, is the court's uncontested finding "discretion, reasonableness, and fair evaluation ... [are] seriously lacking" in the State's response to the needs of Inmates and their attorneys. *Id.* at 902. Moreover, the State's policy is permeated by

a "blanket adversarial position taken against OIDS attorneys representing death row inmates." *Id.* It is from this troublesome canvas that our analysis of the court's legal conclusions proceeds.

The district court premised its conclusions of law on the Supreme Court's fundament that inmates do not forfeit their constitutional rights by virtue of their incarceration, and it reasserted the Fourteenth Amendment's guarantee to prisoners of " 'adequate, effective, and meaningful' access to the courts." *Id.* at 903 (quoting *Bounds v. Smith,* 430 U.S. 817, 822, 97 S.Ct. 1491, 1495, 52 L.Ed.2d 72 (1977)). To that end, access to counsel assured by the Sixth Amendment is essential. Nevertheless, the court recognized while prisoners have Sixth and Fourteenth Amendment rights, "[t]hese principles do not require unfettered exercise of all retained constitutional rights." 828 F.Supp. at 903. It noted state penological interests, federal courts' reluctance to become enmeshed in prison administration, and the need to defer to the expertise of prison personnel in running their institutions must be considered in a proper paradigm. The district court thus asserted while attorney-inmate communication is constitutionally protected, the required level of that contact remained at issue.

The court framed the issue with the guidance of *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), "whether defendants' regulation prohibiting full contact visits between plaintiffs and their personal attorneys (1) infringes upon a retained constitutional right, and, if so, (2) whether the offending regulation is nevertheless permissible as it is reasonably related to legitimate penological interests." 828 F.Supp. at 904. Notwithstanding its recognition of the *Turner* principles, the court concluded it did not have to go beyond the first level of inquiry because the factual evidence demonstrated the present restrictions do not inhibit "meaningful access" to counsel. *Id.* at 905.

Nonetheless, this conclusion contradicts other findings made by the court. Referring to the substantial evidence prison officials exaggerated prison security considerations which negated "the judicial deference nor-

mally accorded to such measures," the court stated, "[w]ere it necessary to resort to the *Turner* analysis, OSP would lose the battle." *Id.,* 828 F.Supp. at 904–05. The court recognized *Turner* "requires a finding of a rational connection between denial of contact and security concerns, as well as the absence of readily available alternatives. Neither finding could be made on the facts presented here." *Id.* at 905 (citations omitted). The court cautioned, however, that while the present system is "not constitutionally impermissible," *id.,* it remained concerned about inconsistent policies and the needs of prisoners with impairments. Similarly, while the court accepted the State's promise to improve telephone communication for double-celled Inmates when feasible, it observed that improved telephone communication would save the State the expense of counsel traveling to OSP more frequently.

Thus, while declaring that non-contact visitation between attorneys and death row Inmates violated the Sixth and Fourteenth Amendments, the district court held the same rights did not guarantee full contact visitation without limitation. Therefore, the court accepted the State's recommendation of a plexiglas or a clear divider at eye level and a longer cord on telephones to assure confidentiality to double-celled Inmates. The court further noted a subsequent report stating, "a hard plastic window [was] inserted into the grate which greatly increases visual perception." *Id.* at 909.

Nevertheless, Inmates persist the right protected by the Sixth Amendment includes full barrier-free access to counsel. Because "inmates must have a reasonable opportunity to seek and receive the assistance of attorneys," *Procunier v. Martinez,* 416 U.S. 396, 419, 94 S.Ct. 1800, 1814, 40 L.Ed.2d 224 (1974), they contend the district court's order falls short. Inmates urge the court hesitated because it believed no other court had reached that conclusion. They contend on the record before the district court, however, it should have applied the *Turner* balancing.

The State responds the court found its accommodations did not burden Inmates' constitutional rights. The State argues the *Turner* balancing is not required here be-

cause there has been no infringement, at this point, of Inmates' rights.

■ From the outset, we agree in large measure with the district court's analysis and especially with its conclusion the Sixth Amendment does not require in all instances full and unfettered contact between an inmate and counsel. Recognizing the record contains opinions that such access is a necessary part of counsel's ability to establish the rapport required to fully acquit counsel's responsibility, we believe this subjective reflection is impossible to translate into a workable legal principle.

There are simply no cases presented to us in which courts have measured counsel's effectiveness by the strength of counsel's emotional bonds with the client. Indeed, presently, effectiveness is measured by the quality of representation presented in court. Until it can be established as a general principle emotional bonding is required for the kind of counseling that meets constitutional muster, we are unwilling to find such a need within the confines of the Sixth Amendment. This is particularly true within the institutional setting in which the Supreme Court has left matters of security to the sound and principled discretion of prison administrators.

Having reached this point, however, we are still not in accord with the conclusion of the district court. While we are equally unwilling to subject courts to management of prison affairs, particularly to those involving security, we think the district court should have completed the project it started.

■ Our first disagreement with the court is the conclusion there can be an acceptable impingement upon a prisoner's constitutional right which negates further inquiry under *Turner*. We do not read the Court's opinion to provide that latitude. As we read the Court's directives, *any* burden placed upon a prisoner's constitutional rights requires a federal court to take the next step to determine whether it is " 'reasonably related' to legitimate penological objectives, or whether it represents an 'exaggerated response' to those concerns." 482 U.S. at 86, 107 S.Ct. at 2260–61. The relevant factors the Court set out to guide us in that inquiry

are (1) whether there is a valid, rational connection between the prison policy and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right; (3) what the impact accommodation of the constitutional right will have on guards, on other inmates, or on the allocation of prison resources; and (4) whether the regulation or policy is an exaggerated response to prison concerns. *Id.,* 482 U.S. at 89–91, 107 S.Ct. at 2262. Given the critical balance that must be preserved between "the 'policy of judicial restraint regarding prisoner complaints and ... the need to protect constitutional rights,' " *id.* at 84, 107 S.Ct. at 2259 (quoting *Procunier v. Martinez,* 416 U.S. at 406, 94 S.Ct. at 1807–08), the *Turner* Court concluded, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interest." 482 U.S. at 89, 107 S.Ct. at 2261.

In this case, the district court, in effect, found the restrictions to free access resulted in an impingement upon the Sixth Amendment right to which Inmates are entitled, but concluded it was not sufficient to negatively affect that right. That conclusion, however, necessarily avoids the analysis of the very areas mandated by *Turner,* which in light of the district court's pronouncement the State "would lose the battle" if that inquiry were made, underscores the very reason the court should have done so.

■ Further, that inquiry would have led the district court to the opposite conclusion because the record demonstrates a lack of rationality in the denial of contact between Inmates and their counsel. Indeed, having found the administration of OSP has permitted Inmates unfettered personal contact with virtually all those with whom they interact *except* their lawyers, the court was required to take the next step.

Thus, we find it disturbing in the *Turner* context the defendants have not provided an explanation why they have singled out attorneys for the restricted contact. Aside from the isolated occasions when cigarettes, chewing gum, pens, and paper clips have been unwittingly passed by uninitiated lawyers to

Inmates, defendants were unable to provide any evidence the restrictions on contact were reasonably related to prison security. When this default is coupled with the overlay of the "blanket adversarial" attitude of the defendants specifically toward OIDS attorneys and the lack of restriction on the contact between Inmates and others, *Turner* suggests the limitation on contacts between lawyers and clients is not related to a legitimate penological interest.

Indeed, the State's failure to provide any rationale for its non-contact policy aligns this case with *Ching v. Lewis*, 895 F.2d 608 (9th Cir.1990), in which the Ninth Circuit reversed summary judgment granted in favor of prison officials because "defendants failed to give any justification to support their decision to deny contact visits to [the inmate]." *Id.* at 610. The Ninth Circuit premised this conclusion on the analysis in *Dreher v. Sielaff*, 636 F.2d 1141 (7th Cir.1980), which

> recognized that while prison administrators are given deference in developing policies to preserve internal order, these policies will not be upheld if they unnecessarily abridge the defendant's meaningful access to his attorney and the courts. The opportunity to communicate privately with an attorney is an important part of that meaningful access.

*Ching*, 895 F.2d at 609 (citations omitted). Thus, the Ninth Circuit held "a prisoner's right of access to the courts includes contact visitation with his counsel." 895 F.2d at 610; *see also Barnett v. Centoni*, 31 F.3d 813, 816 (9th Cir.1994).[1]

Our analysis of the record indicates to the extent the State offered justifications for the OSP policy, the district court found the justifications without substance because the policy is randomly and arbitrarily applied. Indeed, it is even debateable whether any policy exists in the first instance. Although the

district court's reluctance to take the next step and vitiate the no-contact rule in this institution is easily understood, we think the court erred by not doing so.

## II.

Counsel for Inmates also appeal the court's order on their application for attorney fees under 42 U.S.C. § 1988.[2] The district court prefaced that order by recounting the history of the filing of this lawsuit triggering the State's alteration of the no-contact policy. In the court's view, "In spite of defendants' willingness to negotiate, plaintiffs refused to accept the modification regarding attorney visitation and telephone communications as offered, and the matter proceeded to trial."

Hence, in awarding fees under § 1988, the district court stated, "The most prominent factor considered by this Court in evaluating the hours consumed by [counsel] was the marginal degree of success plaintiffs enjoyed by taking this matter to trial." The court asserted all aspects of the case were settled before trial except for the full contact visitation issue and confidential telephone communication between Inmates and counsel. Consequently, believing the action was unnecessarily prolonged, the court reduced the overall expenditure of hours by two-thirds to reflect "what is reasonable in light of the plaintiffs' overall success." The court also criticized "the degree of billed consultation hours between plaintiffs' co-counsel ... and both of their consultations with attorneys for Oklahoma Indigent Defense System." In light of the fact OIDS attorneys are employed by the State, the court believed the 130 consultations billed were excessive albeit co-counsel did less work at full billing. Thus, the court permitted co-counsel to recover only half of their consultation time. The court also found the charges made "by co-

---

1. The lack of any explanation to permit the *Turner* analysis to proceed distinguishes this authority from *Casey v. Lewis*, 4 F.3d 1516, 1520–21 (9th Cir.1993), in which the court stated, "Nothing in *Ching* is to the contrary. We failed to discuss *Turner* in our decision in *Ching*. We did, however, emphasize that the defendants in *Ching* failed to offer any justification whatsoever for their denial of contact visitation, and we referred to

their policy as 'arbitrary.'" *Id.* at 1523 (citation omitted).

2. 42 U.S.C. § 1988(b) provides:
   In any action or proceeding to enforce a provision of section[] ... 1983 ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

counsel [for consultations] with one another are unreasonable because they duplicate services rendered on behalf of plaintiffs" and reduced them by one-half as well.

Finally, the court determined the reasonable hourly rate of compensation for both counsel to be $150 per hour based on the lack of supporting documentation and similar fees awarded two years before at the rate of $150 per hour. In sum, the court awarded $24,745.50 in attorney fees. Counsel do not challenge the award of expenses and costs.

Counsel complain the court used a hindsight view of their success to reshape the history of the suit, asserting not only did they prevail on all claims, but also they materially altered the relationship between these plaintiffs and the State, the touchstone for relief under *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792–93, 109 S.Ct. 1486, 1493–94, 103 L.Ed.2d 866 (1989). Had the district court decided the case on summary judgment, which it chose not to do, many of its concerns would have been obviated, they state. Moreover, they contend a four-year old prevailing rate of $150 per hour should have been sufficient to substantiate the 4.2% increase per year to the $175 per hour fee they requested. Counsel rely on *Ramos v. Lamm*, 713 F.2d 546 (10th Cir.1983), which held, "If the plaintiff has obtained 'excellent results,' the attorney's fees should encompass all hours reasonably expended; no reduction should be made because the plaintiff failed to prevail on every contention: 'the result is what matters.'" *Id.* at 556 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)).

The State responds counsel's time records reveal extensive contact among themselves but "do not show [ ] much contact at all with the putative clients." It asserts, "the State of Oklahoma already provides an entire administrative agency whose job it is to provide defense, including habeas relief, for the class members involved in this instant litigation." The State urges counsel were more interested in establishing their own legal theories and exonerating their own "pet peeves" than in representing the interests of their clients.

■ We review the district court's attorney fee award for abuse of discretion, *Harris v. Champion*, 15 F.3d 1538, 1573 (10th Cir. 1994), and will hold the underlying findings of fact reversible only if they are clearly erroneous. *Homeward Bound, Inc. v. Hissom Memorial Ctr.*, 963 F.2d 1352, 1355 (10th Cir.1992). A court has abused its discretion when it "based its decision on an erroneous conclusion of law or where there is no rational basis in evidence for the ruling." *Wang v. Hsu*, 919 F.2d 130, 130 (10th Cir. 1990) (citations omitted). It is the burden of the party applying for attorney fees to establish the extent and reasonableness of the request, supporting the claim with "meticulous, contemporary time records." *Ramos*, 713 F.2d at 553.

The district court based its award of attorney fees upon two significant circumstances. First, although finding Inmates are prevailing parties under *Hensley*, 461 U.S. 424, 103 S.Ct. 1933, and *Texas State Teachers Ass'n*, 489 U.S. at 792–93, 109 S.Ct. at 1493–94, it determined the case was prolonged by counsel's refusal to accept the State's offer of settlement and going to trial. Believing trial gained nothing that could not have been obtained by settlement, the court decided, in effect, the claim for attorney fees accumulated during trial was not reasonable. Second, the court concluded it was counsel's burden to establish an appropriate hourly rate for their service. Because they failed to support their claim with anything other than their self-serving statements, the court applied the last hourly rate awarded by it for similar service.

In *Joseph A. v. New Mexico Dept. of Human Servs.*, 28 F.3d 1056, 1060 (10th Cir. 1994), we observed attorney fee "awards made under the authority of federal fee-shifting statutes come under close scrutiny." We arrived at this conclusion because these statutes

were not designed as a form of economic relief to improve the financial lot of attorneys, nor were they intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client. Instead, the aim of such statutes was to enable private parties to obtain

legal help in seeking redress for injuries resulting from the actual or threatened violation of specific federal laws.

*United States ex rel. C.J.C., Inc. v. Western States Mechanical Contractors, Inc.,* 834 F.2d 1533, 1548 (10th Cir.1987) (quoting *Pennsylvania v. Delaware Valley Citizens' Council For Clean Air,* 478 U.S. 546, 565, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986)). Moreover, "hours that are not properly billed to one's *client* are not properly billed to one's *adversary* pursuant to statutory authority." *Joseph A.,* 28 F.3d at 1060 (quoting *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1940) (further citations omitted) (emphasis in original). Guided by these principles, the district court ruled that even though counsel had achieved success for their clients by filing this action, the most critical factor is the "degree of success obtained." *Hensley,* 461 U.S. at 436, 103 S.Ct. at 1941. The district court's refusal to award compensation for going to trial reflected its apparent recognition of the limited degree of counsel's success, based on the court's belief no additional relief was achieved as a consequence. Given our conclusion here, however, that assumption is not entirely correct, and the result it spawned, reducing the total number of hours by two-thirds, must be reconsidered in light of the outcome of this appeal.

■■■ Nevertheless, on the record before us, halving the compensable time allowed for each attorney because of duplication of their services was reasonable. *Id.* at 435–36, 103 S.Ct. at 1940–41. While there is no mechanical formula to apply to determine when greater efforts may be necessary to obtain certain results, *Ramos,* 713 F.2d at 554, we believe the district court was in the best position to evaluate the services provided here and recognize what efforts were redundant. Finally, under the *Ramos* factors this circuit utilizes to determine a reasonable hourly rate, the district court correctly determined the $150 per hour figure based on "what lawyers of comparable skill and experience practicing in the area in which the litigation occurs would charge for their time." *Id.* at 555. Because the setting of a reasonable hourly rate is within the district court's discretion, *Carter v. Sedgwick County, Kan.,* 36 F.3d 952, 956 (10th Cir.1994), we will not

second-guess the court's familiarity with the case and prevailing rates in the area, particularly when there is no other evidence to support counsels' argument. *Compare Zuchel v. City & County of Denver, Colo.,* 997 F.2d 730, 746 (10th Cir.1993) (hourly rate supported by affidavits of several local attorneys familiar with plaintiffs' work).

Given the scope of our review, we find no abuse of discretion or findings of fact that are clearly erroneous in the awarding of fees. Nonetheless, because of the conclusion we have reached on the merits, we must remand for further consideration of the value of the services rendered.

### III.

■■ After trial and the court's entry of judgment which included dissolving stays of execution it previously entered, plaintiffs moved to stay new execution dates set by the Oklahoma Court of Criminal Appeals for seven Inmates. The court denied the motions on the ground plaintiffs had not met the burden for stay pending appeal under Fed. R.Civ.P. 62(c). In addition, it found "it is certainly not in the best interests of the public to further delay criminal appeals, further erode the public's confidence in the finality of criminal judgments, and further denigrate whatever deterrent effect the death penalty may have."

Counsel allege each of the seven Inmates whose execution date has been set has completed a direct appeal and is poised for a first habeas application. Counsel underscore the importance of thorough preparation for this review. They assert this court has authority under the All Writs Act, 28 U.S.C. § 1651(a), to issue the stays.

We are not disposed to disturb the district court's denial of the stays. Each of the plaintiffs will have an ample opportunity to stay execution upon the filing of an appropriate proceeding in the district court. Until that time, we see no proper grounds to enter such an order.

The judgment of the district court is **AF-FIRMED IN PART, REVERSED IN PART,** and **REMANDED** with directions to

enter an order invalidating the present restrictions on contact visits between all class members and their counsel in accordance with the views we have expressed in this opinion. The district court shall also reconsider the award of attorney fees to determine whether the amount should be increased as a result of this appeal.